**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Armando Balbino RAMOS, Evaristo Ramos, Defendants–Appellants.**

**No. 89–6267.**

United States Court of Appeals, Eleventh Circuit.

June 18, 1991.

Benedict P. Kuehne, Benson B. Weintraub, Miami, Fla., for Armando Balbino Ramos.

Jon May, Miami, Fla., for Evaristo Ramos.

Dexter W. Lehtinen, U.S. Atty., Linda Collins Hertz, Asst. U.S. Atty., David Mandel, Miami, Fla., for U.S.

Before HATCHETT and BIRCH, Circuit Judges, and RONEY, Senior Circuit Judge.

PER CURIAM:

In this cocaine possession with intent to distribute case, we refuse to apply our en banc holding in *United States v. Piccinonna*, 885 F.2d 1529 (11th Cir.1989), retroactively and affirm the judgments and sentences.

## FACTS

On December 8, 1988, Drug Enforcement Agency (DEA) officials arrested Evaristo and Balbino Ramos after seizing several kilograms of cocaine, a cache of firearms, drug paraphernalia, and approximately $30,000 in cash from their house and from Balbino Ramos's automobile. Four versions of the facts surrounding the events at the house prior to the arrest exist due to the DEA agents' conflicting reports and testimony. We discuss all three versions because the issues presented for resolution arise out of this factual uncertainty.

The first version of the events at the house came from DEA Special Agent Keith Curtis who drafted the affidavit and Complaint presented to the United States Magistrate Judge. According to Curtis's affidavit, on December 7, 1988, a cooperating individual (CI) advised DEA agents that Evaristo and Balbino Ramos had showed her several kilograms of cocaine and had agreed to sell her a large quantity of cocaine. They stated they could conduct a transaction on the following day. On December 8, 1988, the CI went to the Ramoses' residence under DEA surveillance to

970

conduct a fifteen-kilogram cocaine deal. Shortly after her arrival, she entered the house, exited five to ten minutes later, and advised the DEA agents that at least five kilograms of cocaine and an unknown amount of cash were in the house. Evaristo Ramos then drove to the house in a black Lincoln automobile and after observing the agents, ran into the house. The DEA agents pursued Evaristo Ramos into the house and discovered him in the bathtub attempting to flush approximately three kilograms of cocaine down the bathtub drain.

Although Agent Curtis participated in events following the Ramoses' arrest, he did not see what occurred on the property prior to the arrest. Curtis based parts of his affidavit, the portions regarding what occurred on the property, on portions of conversations he overheard and on what he surmised.

On December 16, 1988, Special Agent Bigoness testified before a federal grand jury in connection with the Ramoses' indictment. Like Curtis, Bigoness did not witness the events prior to the arrest because he was part of the DEA surveillance team outside the property. Thus, Bigoness based part of his grand jury testimony on Curtis's affidavit. According to Bigoness's testimony, the CI went inside the house to arrange the deal with the Ramoses and after purchasing approximately eight kilograms of cocaine, came outside and gave the agents a prearranged arrest signal. The agents then went inside the house, found Evaristo Ramos in the bathtub attempting to dispose of the cocaine, and arrested Evaristo and Balbino Ramos.

The grand jury indicted the Ramoses on charges of conspiracy to possess with the intent to distribute cocaine and possession with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The Ramoses filed a motion to suppress the cocaine and money seized from their house arguing that the agents did not have a warrant, probable cause, or exigent circumstances to support the search of the house. In March, 1989, the district court conducted a suppression hearing during which Agent Kirkman testified. Kirkman is the only DEA agent who witnessed the events between Evaristo Ramos and the CI outside the house. According to Kirkman, he drove the CI to the Ramoses' house on December 8. The CI got out of the car and began walking toward the house, leaving Kirkman in the car. As the CI approached the house, Evaristo Ramos drove a black Lincoln Continental into the driveway behind Kirkman's car. Ramos got out of the car, walked past Kirkman sitting in his car, and met with the CI. After a few moments, Evaristo Ramos and the CI walked over to the carport where Ramos took a shopping bag from a Corvette. Ramos gave the bag to the CI who examined it and then signaled to Kirkman that the bag contained cocaine.

Agent Kirkman further testified that after receiving the prearranged arrest signal, he radioed the other DEA agents stationed outside the parameters of the Ramoses' property as Evaristo Ramos began moving rapidly toward the house. DEA agents responded to the call and followed Ramos into the house through the back door. They found Evaristo fully clothed in a bathtub attempting to force several kilograms of cocaine down the drain. The agents then conducted a sweep search of the house and seized additional cocaine, firearms, and approximately $15,000 in cash. The government's trial theory was the Kirkman version.

At the suppression hearing, the Ramoses called several witnesses, three of whom testified that they saw the CI exit a car on December 8, 1988, and meet with Evaristo Ramos. None of the Ramoses' witnesses, however, remembered seeing Agent Kirkman. The Ramoses also called Agent Curtis as a witness during the suppression hearing and questioned him at length about the circumstances surrounding his affidavit and its inaccuracies. Curtis admitted that he had based the inaccurate statements in his affidavit on portions of conversations he had overheard after the arrest. He further admitted that he had not spoken with Agent Kirkman, the only agent who actually witnessed the events prior to the Ramoses' arrest.

Evaristo Ramos's counsel also proffered his client's description of the events preceding the arrest. According to the proffer, Evaristo Ramos was leaving the vicinity of the house when he saw a car pull into the driveway. He turned in behind the car and an unknown woman exited the car. Upon reaching the woman to inquire about her identity, she informed him that she was a friend, that the police were coming, and that he should give her all the cocaine. Ramos then walked briskly toward the house, with the CI close behind him. According to Ramos's proffer, he did not hand the CI a bag taken from a Corvette in the carport, nor did he see the agents until he approached his brother's room after entering the house.

The district court accepted the Kirkman version of events at the house and found probable cause and sufficient exigent circumstances to support the warrantless search of the Ramoses' house. Thus, the court denied the Ramoses' motion to suppress the physical evidence seized from the house.

## PROCEDURAL HISTORY

On June 16, 1989, the same grand jury that had returned the first indictment returned a superseding indictment against the Ramoses. The new indictment contained the original conspiracy to possess and possession with the intent to distribute cocaine charges, but added a third count charging the Ramoses with unlawful use of a telephone to facilitate a felony, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2. The jury convicted the Ramoses on all three counts, and the district court sentenced each of them to 240 months imprisonment as to Count I, 96 months imprisonment as to Count II, and 200 months imprisonment as to Count III, for a total of 20 years imprisonment each. Both Ramoses

also received a sentence of ten years supervised release following their incarceration for Counts I and III, and one year for Count II.

## CONTENTIONS

The Ramoses contend that their convictions and sentences should be overturned because the district court: (1) improperly denied their motion to suppress; (2) made statements during the suppression hearing which indicated bias and unfairly permeated the entire trial; (3) improperly limited testimony of a defense witness during trial; and (4) failed to consider relevant polygraph evidence.

In response, the government contends that the Ramoses' sentences and convictions should be affirmed.

## ISSUES

■ We consider the following issues: (1) whether the district court erred in denying the motion to suppress; (2) whether the district court's statement indicated a bias that affected its rulings; (3) whether the district court erred in excluding a defense witness's testimony; (4) whether the district court erred in excluding polygraph testimony; and (5) whether this court should recommend an investigation into the agents' conduct.[1]

## DISCUSSION

1. Motion to Suppress

■ According to the Ramoses, the warrantless search and his arrest violated the fourth amendment because neither probable cause nor exigent circumstances existed.

---

**1.** The Ramoses contend that based on the DEA agents' conflicting statements of events, this court should compel the United States Department of Justice to undertake an investigation of the agents' conduct. At the time of oral argument, all of the allegations regarding the agents' misconduct had already been referred to the Internal Affairs Department of the Drug En-

forcement Administration. Criminal investigations are an executive function within the exclusive prerogative of the Attorney General's Office. *United States v. Cox,* 342 F.2d 167, 190 (5th Cir.1965). Accordingly, the Ramoses' request that this court order an investigation into the agent's conduct is denied.

*Standard of Review*

The district court's denial of a motion to suppress is a mixed question of law and fact. *United States v. Nixon,* 918 F.2d 895, 902 (11th Cir.1990). The appellant must show that the district court's factual findings were clearly erroneous. *See United States v. Newbern,* 731 F.2d 744, 747 (11th Cir.1984). We then review the district court's application of law to those facts *de novo. See Adams v. Balkcom,* 688 F.2d 734, 739 (11th Cir.1982). We will construe the facts in the light most favorable to the government. *United States v. Baron–Mantilla,* 743 F.2d 868, 870 (11th Cir.1984).

■ Warrantless and nonconsensual entry into a suspect's house to make a felony arrest is prohibited under the fourth amendment, unless probable cause and exigent circumstances exist. *See Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). "Probable cause to search exists where the facts lead a reasonably cautious person to believe that the 'search will uncover evidence of a crime.'" *United States v. Burgos,* 720 F.2d 1520 (11th Cir.1983). Exigent circumstances exist "when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Satterfield,* 743 F.2d 827, 844 (11th Cir.1984).

The district court found that the DEA agents had probable cause to search the house after Agent Kirkman saw Evaristo Ramos hand the shopping bag to the CI and saw the CI give the prearranged signal indicating that the bag contained cocaine. The district court concluded that at that moment Kirkman witnessed Evaristo Ramos commit a crime in his presence. Thus, probable cause existed to arrest Evaristo Ramos. The Supreme Court has held that a suspect may not defeat an imminent arrest by escaping into his house. *See United States v. Santana,* 427 U.S. 38, 43, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976). Upon entering the house, the agents discovered Evaristo Ramos attempting to destroy several kilograms of cocaine. Consequently, the agents were put on notice that

cocaine was in the house and could be easily destroyed. The district court further found that once inside the house, sufficient exigent circumstances existed to search the house without a warrant. Balbino Ramos's arrest is not in issue.

The district court correctly applied the applicable law to the circumstances of this case in finding probable cause and exigent circumstances. Even though the pursuit ended almost as soon as it began, it can nonetheless be characterized as "hot pursuit." Thus, the circumstances of the present case were sufficiently exigent to justify the warrantless entry and search of the Ramoses' house. *See United States v. Standridge,* 810 F.2d 1034 (11th Cir.1987).

In *Standridge,* this court also stated that factors other than hot pursuit may indicate exigent circumstances. Such factors include: (1) the gravity of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is on the premises being entered; and (5) a likelihood that delay could cause the destruction of evidence or jeopardize the safety of the officers. *Standridge,* 810 F.2d at 1037.

The facts of this case clearly support the application of the *Standridge* doctrine. The Ramoses were being charged with possessing with the intent to distribute at least five kilograms of cocaine, a major felony. Agent Kirkman had probable cause to believe that Evaristo Ramos had given the CI cocaine outside the house after receiving the CI's prearranged signal. Kirkman saw Evaristo Ramos enter the house. Consequently, we find that the district court correctly denied the Ramoses' motion to suppress the evidence seized from the house. *See United States v. Marszalkowski,* 669 F.2d 655, 665 (11th Cir.1982).

2. District Court's Statements

■ The Ramoses also contend that during the motion to suppress hearing, the district court exhibited a bias and prejudiced attitude against them which prevented fair resolution of the suppression issue. The Ramoses point to the following statements made by the district court:

THE COURT: All right, I don't know where you want to go from here, but if you are asking me to believe the testimony of a couple of drug dealers, who obviously are drug dealers because their house was full of cocaine and they had it, as opposed to some agents, it's not even close who I am going to believe.[2]

The Ramoses argue that the district court refused to listen to them under oath, and the district court's statements prejudiced the rulings on the merits of the suppression motion. Accordingly, they argue that the district court's refusal to listen to them under oath suggests, at a minimum, that the court's concern was not with assessing the truth, but was focused on resolving the motion against them.

*Standard of Review*

We will not reverse a conviction based upon comments of the trial judge unless the comments are so prejudicial as to amount to denial of a fair trial. *United States v. Preston,* 608 F.2d 626, 636 (5th Cir.1979). "The general rule is that bias sufficient to disqualify a judge must stem from extrajudicial sources and must be focused against a party to the proceedings." *Hamm v. Members of the Bd. of Regents of the State of Florida,* 708 F.2d 647, 651 (11th Cir.1983). An exception to this rule exists when a judge's remarks demonstrate such pervasive bias and prejudice that it unfairly prejudices one of the parties. *Whitehurst v. Wright,* 592 F.2d 834, 838 (5th Cir.1979).

We first note that the Ramoses' counsel misrepresents the record in stating that the district court refused to admit their live testimony. Counsel opted to proffer the Ramoses' testimony rather than put them on the stand to testify. The district court accepted counsels' proffer regarding the Ramoses' description of the events surrounding their arrest. Following the proffer, Balbino Ramos's counsel then proceeded to question the legality of the cocaine taken from the Corvette.

Although the district court's choice of words was poor, a review of the record shows that the Ramoses received a fair hearing and trial. The record indicates that the district court's statements were intended as a credibility finding. The Ramoses proffered several statements to negate Agent Kirkman's testimony that Evaristo Ramos gave the CI a bag containing cocaine outside the house. After hearing the government's witnesses, and after listening to the defense proffer, the court chose to believe the agents. Certainly, the court could have simply stated that after hearing the evidence presented and the proffer, it found the agent's testimony more credible. Instead, the court used language that, when taken out of context, seems to raise serious questions of bias and prejudice. In context, however, it is clear that the court was simply making a credibility ruling. The court's credibility ruling, though adverse to the Ramoses, does not indicate pervasive bias. *See*

**2.** The events leading up to the district court's statements are as follows:

MR. STECKEL: Our proffer would be that the alarm was on.

THE COURT: I don't know what your witnesses would say. Did they have to deactivate it before they could look in the car?

MR. LOWE: I haven't spoken to them, but my proffer would be based on my knowledge of what our witnesses would say, is that they heard no alarm and no alarm went off at the time the canvas was removed from the paper, or at any time that the cocaine was on the trunk of the car or the back of the car.

By the way, Judge, the Corvette itself, the court knows a Corvette has got sort of a slopey back. There is hardly any back to it at all.

THE COURT: I got a photograph of the back. I can see.

MR. LOWE: There is no testimony that the cocaine, the 10 pounds that Mr. Steckel talked about came from the car itself. The testimony was that it came from under a tarpaulin which was covering the car, and whether the bag was on top of the car or under the tarp under the car, we don't know.

All we have is somebody removed the tarp, reaching in and pulled out a bag. We don't know if it was on the ground underneath the car or the bag was on the back of the car. We don't know because that's not been the testimony, and stop it, okay.

THE COURT: All right, I don't know where you want to go from here, but if you are asking me to believe the testimony of a couple of drug dealers, who obviously are drug dealers because their house was full of cocaine and they had it, as opposed to some agents, it's not even close who I am going to believe.

*Hamm v. Members of the Bd. of Regents of the State of Florida,* 708 F.2d at 651. In fact, the Ramoses probably got more consideration through a proffer than the law demanded in their contest with live witnesses.

■ Our conclusion on this issue is buttressed by the fact that Balbino Ramos's counsel took the court's statement as a credibility finding when he stated: "Then the court, what the court is doing is making a ruling at that point that credibility wise [sic] it is finding factually that my client handed the cocaine to the agents. Now we can get into the legal argument besides that. . . ." Counsel did not object to the court's statements, neither did they question the court's alleged bias at the time of the statement. Thus, they failed to preserve the issue of the district court's bias, and in the absence of fundamental error, they cannot now raise the bias issue. *See United States v. Block,* 755 F.2d 770 (11th Cir.1985). We have examined the bias issue for fundamental unfairness, and find no reversible error.[3]

### 3. Limitation of Frank Alvarez's Testimony

■ The Ramoses next object to the district court's limitation of Frank Alvarez's testimony. They argue that the court's limitation denied them the right to present witnesses in their own defense, and therefore violated the requirements of due process. Additionally, the Ramoses contend that the district court erred in limiting Alvarez's testimony because it was admissible as a statement of a coconspirator under Federal Rule of Evidence 801(d)(2)(E).

### Standard of Review

A district court's ruling regarding admission of testimony at trial is reviewed for abuse of discretion. *United States v. Penn,* 721 F.2d 762, 766 (11th Cir.1983). A criminal defendant's right to present witnesses in his own defense during a criminal trial lies at the core of the fifth and fourteenth amendment guarantees of due process. *Boykins v. Wainwright,* 737 F.2d

1539 (11th Cir.1984) (citing *Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562 (1975)). A defendant's right to a fair trial is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor. *Osborne v. Wainwright,* 720 F.2d 1237, 1238 (11th Cir.1983).

The Ramoses' theory at trial was that the DEA agents and the CI planted the cocaine in their house and stole several thousand dollars in cash from their safe in the house. To support this theory, the Ramoses solicited testimony from Frank Alvarez to impeach the CI and the agents' credibility. At the time of the trial, Alvarez was incarcerated on charges of dealing in a multi-kilogram cocaine transaction. Outside the jury's presence, Alvarez testified that he had met with the CI in New York City with several New York DEA agents. According to Alvarez, the CI and the New York DEA agents discussed stealing drugs from dealers, selling the drugs, and splitting the proceeds. Upon further questioning, Alvarez testified that he was never approached by any Miami DEA agent regarding the Ramoses or any other illegal activities. The district court concluded that the CI's alleged statements to Alvarez in New York did not implicate the Miami DEA agency officers. Thus, the district court refused to admit Alvarez's testimony regarding his alleged conversation with the CI and DEA agents in New York.

As the district court found, Alvarez's testimony regarding his alleged conversation with the CI in New York was not crucial, critical, or highly significant to the Ramoses' defense. *Osborne v. Wainwright,* 720 F.2d 1237 (11th Cir.1983). Alvarez's testimony did not link any improprieties between the CI and New York DEA agents to the Ramoses or the Miami DEA agents. Thus, the testimony was correctly excluded.

■ The Ramoses nevertheless argue that the district court erred in excluding Alvarez's testimony because such testimo-

---

3. We find counsels' misconstruction of the record in stating that the district court refused to allow their clients to testify to be nefarious.

Consequently we caution counsel that although this court welcomes zealous representation, misconstruction of the record will not be tolerated.

ny was admissible under rule 801(d)(2)(E) as a statement of a coconspirator in furtherance of a conspiracy. The district court ruled that Alvarez's testimony was inadmissible under Federal Rule of Evidence 608(b). Such a ruling, the Ramoses argue, is inapplicable in determining the admissibility of relevant, competent evidence introduced to contradict a witness's testimony as to a material fact. *United States v. Opager*, 589 F.2d 799, 802 (5th Cir.1979).

The Ramoses' contention regarding the 801(d)(2)(E) ruling is flawed in its inception. To bring the CI's alleged statements to Alvarez under rule 801(d)(2)(E), the Ramoses had to prove that Alvarez was a coconspirator and that his statement was made during the conspiracy on trial and in furtherance of that conspiracy. The Ramoses failed to offer any evidence at trial to prove such a conspiracy. Additionally, the physical evidence found in the house, including a drug ledger in Balbino Ramos's handwriting detailing large drug transactions, refutes the Ramoses' theory that the CI and the DEA agents planted cocaine in the house.

Contrary to the Ramoses' contention, rule 608(b) directly applies to this case and also mandates exclusion of Alvarez's testimony.[4] The CI's alleged statement to Frank Alvarez suggesting that the New York DEA agents and Alvarez rob drug dealers for money and drugs is a specific instance of conduct which the Ramoses wish to use to attack the CI's credibility. *See United States v. Martino*, 648 F.2d 367, 397 (5th Cir.1981). Rule 608(b), specifically prohibits introduction of such evidence. Thus, the district court correctly excluded Alvarez's testimony.

### 4. Polygraph Evidence

The Ramoses further object to the district court's failure to accept polygraph

evidence regarding their version of the arrest. The Ramoses concede, however, that the precedent existing at the time of the district court's ruling did not permit the introduction of polygraph evidence at trial. The Ramoses note that shortly after the completion of trial, this court sitting *en banc* decided *United States v. Piccinonna*, 885 F.2d 1529 (11th Cir.1989).

### Standard of Review

Under our en banc decision in *United States v. Piccinonna*, 885 F.2d 1529, 1536 (11th Cir.1989), polygraph evidence should not be admitted even for limited purposes unless the district court determines that "the probative value of the polygraph evidence outweighs the potential prejudice and time consumption involved in presenting such evidence." *Piccinonna*, 885 F.2d at 1536 (quoting *United States v. Miller*, 874 F.2d 1255 (9th Cir.1989)).

The Ramoses now argue that even though the *Piccinonna* rule had not been announced at the time of this trial, they gave the government notice and an opportunity to participate in the polygraph testing; therefore, they have materially complied with *Piccinonna*. They further argue that the polygraph results directly support their version of the case because the results showed (1) they never planned or agreed to give cocaine to the CI; (2) they never saw the CI before her December 8 arrival onto their property; (3) they never offered cocaine to the CI; and (4) they had at least $40,000 in their house when arrested. Thus, they conclude that the district court erred in refusing to allow the polygraph evidence to be introduced.

The Ramoses' allegation of error regarding the polygraph evidence must fail for several reasons. First, as the Ramoses concede, at the time of the trial, this circuit

---

**4.** Rule 608(b) provides:

Evidence of character and conduct of witness. **(b) *Specific instances of conduct.*** Specific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

had a *per se* rule which excluded all polygraph evidence from trial. Therefore, the district court would have violated existing Eleventh Circuit precedent had it admitted the Ramoses' polygraph evidence.

Second, since *Piccinonna* was decided after the Ramoses' trial, this court would have to apply that precedent retroactively to grant the Ramoses the relief they seek. In *Chevron Oil v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court set out the standards for retroactive application of a new precedent. According to the Court, retroactive application of new precedent is necessary when: (1) the new precedent establishes a new principle of law either by overruling clear past precedent on which the litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) the court must weigh the merits and the demerits in each case by looking to the prior history of the rule in question, its purposes and effect, and whether retroactive operation will further or retard its operation; and (3) the court must weigh the inequity imposed by retroactive application. *Chevron,* 404 U.S. at 107, 92 S.Ct. at 355. Although *Piccinonna* represented a new principle of law regarding polygraph examinations, we find that the equities of this case weigh heavily against the Ramoses. Thus, we will not apply *Piccinonna* retroactively.

Furthermore, even retroactive application of *Piccinonna* to the present polygraph results would not be of benefit to the Ramoses. In *Piccinonna,* this court stated that polygraph evidence will not be admitted unless three preliminary conditions are satisfied: (1) the party introducing the polygraph evidence must provide the adversary party with adequate notice that the testimony will be introduced; (2) the opposing party must have a reasonable opportunity to administer a substantially similar test using its own experts; and (3) the expert's testimony is still subject to Federal Rules of Evidence such as rule 608. *Piccinonna,* 885 F.2d at 1536. The record does not demonstrate that the government was given adequate notice or afforded a reasonable opportunity to administer its own polygraph examination.

Additionally, this court stated in *Piccinonna* that polygraph evidence is not admissible until a witness's credibility is attacked. *Piccinonna,* 885 F.2d at 1536. As we stated earlier, the Ramoses' counsel chose to proffer their testimony rather than to place them on the stand to testify. Indeed, counsel made a tactical decision not to have the Ramoses take the stand to avoid any attacks on their credibility. Since the Ramoses' credibility was not in fact attacked, the polygraph evidence could not be admitted to support their theory of the case.

## CONCLUSION

We find that the district court properly denied the Ramoses' motion to suppress, limited Frank Alvarez's testimony, excluded polygraph examination evidence, and correctly refused to investigate the agents' conduct.

Accordingly, we affirm the judgments and sentences.

AFFIRMED.