[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15436
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 19, 2010
JOHN LEY
CLERK

D. C. Docket No. 09-00078-CR-T-33-EAJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES STANTON PERRY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 19, 2010)

Before HULL, PRYOR and MARTIN, Circuit Judges.

PER CURIAM:

After a jury trial, James Stanton Perry appeals his conviction for being a

felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). After review, we affirm.

## I. BACKGROUND

Because Defendant Perry claims the district court erred in certain evidentiary rulings at trial, we review not only the history of the case, but also the trial testimony in detail.

## A. Investigation of Burglary

In the fall of 2008, a series of burglaries occurred in Hillsborough County, Florida, including a burglary at the home of Kevin Scully on October 21, 2008. Scully is a special agent with the federal Drug Enforcement Administration ("DEA") and a supervisor of a Tampa task force consisting of DEA agents and deputized local law enforcement officers who investigate narcotics crimes.

Detective Joseph Garcia of the Hillsborough County Sheriff's Office was in charge of investigating the burglaries. During the investigation, Garcia had the assistance of other Sheriff's Office detectives: Maurique Diaz and James Howard. Garcia, Diaz and Howard were not part of Scully's DEA task force.

Agent Scully met with Detective Garcia and offered his assistance. Agent Scully then asked several DEA task force members, including Detective Angel Cruz of the Sheriff's Office, to assist Detective Garcia.

2

Defendant Perry was a suspect in the burglaries. An eyewitness saw a man leave Agent Scully's house and walk to a nearby Starbucks, where he called a taxicab. Investigators obtained a videotape from Starbucks showing the man, which investigators believed was Perry. Investigators learned from the taxi driver that the man was dropped off at an apartment belonging to Perry's girlfriend. The apartment management identified Perry as having recently lived at the apartments. Detective Cruz conducted surveillance on Perry's girlfriend, which led him to a house on Sunlake Boulevard. Detective Cruz knew that Perry had an outstanding warrant for his arrest on a charge of grand theft auto.[1]

On the morning of December 9, 2008, Detective Cruz, along with Agent Scully and several DEA task force agents, conducted surveillance on the Sunlake Boulevard house. Detective Cruz saw Perry and another man, later identified as Steven Tuttle, enter a U-Haul truck and drive away. Tuttle drove the truck with Perry in the passenger seat. Detective Cruz stopped the U-Haul truck and arrested Perry under the warrant.

Defendant Perry was taken to the Hillsborough County Sheriff's Office substation. During an interview with Detective Garcia, Defendant Perry denied living at the Sunlake Boulevard house, stating that he had only stored a couch there

---

[1]In 1995, Perry was convicted of two gun-related felonies: armed robbery and grand theft of a firearm.

and lived in an apartment on Memorial Highway. Detective Garcia forwarded this information to the officers at the Sunlake Boulevard house.

**B.**     **Firearm Ammunition at Sunlake Boulevard House**

While Perry was taken to the Sheriff's Office, Detective Cruz, Agent Scully and other officers went with Tuttle back to the Sunlake Boulevard house. Tuttle and his mother, Lori Bennett, leased the Sunlake Boulevard house.

Tuttle told the officers that he had rented the basement to Perry the day before. The officers believed the house contained items stolen during the burglaries. Tuttle and Ms. Bennett signed consent to search forms for the Sunlake Boulevard house. The officers searched the basement and found stolen property, including a watch belonging to Agent Scully. In the basement, Detectives Cruz and Diaz found a bag containing jewelry, cell phones, a gun loaded with six bullets and an identification card belonging to Perry.

**C.**     **Interviews of Defendant Perry**

Three days later, on December 11, 2008, Detectives Cruz and Diaz interviewed Defendant Perry in jail. Perry admitted (1) committing numerous burglaries, including the one of Agent Scully's home; and (2) owning the firearm found in the Sunlake Boulevard basement. Perry said he bought the firearm at a pawn shop for $250. In a follow-up interview on December 17, 2008, Perry again

4

admitted that he owned the firearm.

In federal court, Perry was indicted on one count of being a felon in possession of six rounds of ammunition.[2] Before trial, Perry moved to suppress (1) the evidence seized at the Sunlake Boulevard house; and (2) his two confessions to the investigators. Defendant Perry claimed only that the search was performed without valid consent and thus his confessions were fruits of an illegal search.

## D. Suppression Hearing

At a suppression hearing Detectives Cruz, Garcia and Howard testified, as well as Tuttle and his mother. Detective Cruz testified about the burglary investigation, Defendant Perry's arrest and the search of the Sunlake Boulevard house. According to Detective Cruz, Tuttle gave investigators permission to search the basement, and both Tuttle and his mother, Bennett, signed forms consenting to the search.

Detective Garcia testified that he advised Defendant Perry of his Miranda rights and Perry confessed to burglarizing Agent Scully's house. When Garcia asked Perry where he lived, Perry said he lived at an apartment on Memorial

---

[2]Perry stipulated to being a convicted felon. At trial, an expert with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") testified that an interstate nexus could not be established as to the firearm because it was manufactured in Florida, but that the six bullets found in the firearm were manufactured in Idaho.

5

Highway. Perry told Garcia he did not live at the Sunlake Boulevard house, but only stored a couch there. Detective Howard, also present at the interview, corroborated Detective Garcia's testimony.

Detective Diaz testified that soon after arriving at the Sunlake Boulevard house, he received a call from Detective Garcia advising him that Perry claimed not to live at the house. Detective Diaz informed Detective Cruz of this information. Diaz also asked Ms. Bennett if Perry lived at the house, and Bennett responded that he did not. Detective Diaz was present during the search of the basement and saw Detective Cruz find the bag containing the loaded firearm.

Detective Diaz recounted his December 11 jail interview with Defendant Perry. Perry admitted owning the gun found at the Sunlake Boulevard house and said he had purchased it for $250. According to Diaz, Perry agreed to give a written statement at a later time because Diaz did not have the proper forms.

On December 17, 2008, Diaz returned to obtain the written statement from Perry. At first Perry said he had obtained counsel and had nothing to say. After Diaz said he would consult Perry's attorney about obtaining a statement, Perry changed his mind. Perry agreed to talk with Diaz, but refused to give a written statement. After Diaz advised Perry of his Miranda rights and had Perry sign a consent to be interviewed, Perry reiterated that he owned the firearm found at the

6

Sunlake Boulevard house.

Tuttle and Bennett, the tenants of the Sunlake Boulevard house, testified for the defense. Bennett stated that the officers who searched the house were unprofessional, would not allow her to talk to her son and would not allow her to go in the house. According to Bennett, officers told her they were waiting on a warrant and, after waiting for about an hour and a half, presented her with a paper with the word "warrant" on it and asked her to sign it. Bennett signed the paper, but said she did not know she was consenting to a search and did not tell officers they could go down to the basement. However, Bennett agreed that she had signed a consent to search form.

Tuttle testified that he was a friend of Perry's and that Perry rented the basement from him and his mother. Perry had stayed at the house for a few nights before his arrest.

According to Tuttle, when officers asked if they could search the house, he was initially unsure. When officers said they either could get a warrant or he could consent to the search, Tuttle told the officers to "do what you need to do." After waiting outside the house for two hours, another detective arrived with a paper and told Tuttle he needed to sign it. Tuttle remembered seeing the word "warrant" in big red letters at the top of the paper. Tuttle agreed that he had signed a consent to

search form. Tuttle thought, however, that he was signing a warrant and did not knowingly give consent for officers to enter the house.

The magistrate judge issued a report ("R&R") recommending that Perry's motion to suppress be denied. The R&R found that, although Perry rented the basement of the Sunlake Boulevard house, his statements to Detective Garcia that he did not live there undercut his subjective expectation of privacy in the basement and the items stored there. The R&R recommended denying the motion to suppress because Perry's Fourth Amendment rights were not implicated in the search. The magistrate judge also found that Perry knowingly and voluntary waived his Miranda rights as to his statements to Detective Garcia on the day of his arrest and to Detective Diaz several days later at the jail. As to Detective Diaz's second interview, the magistrate judge found that Detective Diaz properly ceased questioning when Perry indicated he was represented by counsel, and that Perry voluntarily initiated the subsequent conversation and knowingly and intelligently signed the Miranda waiver form.

The district court adopted the R&R over Perry's objection. The district court clarified that the R&R did not find that Perry did not enjoy a valid expectation of privacy at the Sunlake Boulevard house, but that Perry had abandoned that expectation when he denied living there.

8

**E. Perry's Motion in Limine**

In a pretrial memorandum, the government stated that it intended to introduce evidence that Perry had two prior 1995 firearm-related felony convictions for armed burglary of a dwelling and grand theft of a firearm. Perry filed a motion in limine to exclude the evidence as inadmissible under Federal Rules of Evidence 403 and 404(b).

The district court denied Perry's motion, finding that the evidence showing that Perry had committed an armed burglary and possessed stolen firearms in the past was probative to demonstrate knowledge, opportunity, lack of mistake, and that he possessed the firearm in the instant case. The district court stated that, under the Rule 403 balancing test, Perry's prior firearm-related convictions demonstrated a clear connection to his knowingly possessing a firearm in the instant case and the risk of undue prejudice to Perry could be reduced with a limiting jury instruction.

**F. Trial**

At trial, Perry's defense was that (1) the officers investigating the burglary of Agent Scully's home believed Perry was the burglar, (2) the evidence linking him to the burglary was weak, and (3) thus the officers framed him for the federal firearm offense by planting the firearm at the Sunlake Boulevard house and by

9

fabricating Perry's two confessions.

1.     Government's Trial Witnesses

During the government's case, inter alia, Detectives Cruz and Diaz testified about the burglary investigation, Perry's arrest, the search of the Sunlake Boulevard house and Perry's two confessions to owning the firearm and burglarizing Agent Scully's house.  The detectives denied planting evidence at the Sunlake Boulevard house or fabricating Perry's confessions.

Perry's counsel cross-examined Detectives Cruz and Diaz at length. Detective Cruz testified that Agent Scully was his supervisor, they visited socially, and he knew Agent Scully's 14-year-old daughter, who was in the house during the burglary.  Although state officers serving as DEA task force members ordinarily would not be involved in burglary investigations, the state officers participating in the surveillance of Perry and his girlfriend were also DEA task force agents. Detective Cruz acknowledged that he used DEA magnetic tracking devices on Perry's girlfriend's car and the U-Haul truck during the surveillance.  Agent Scully was present throughout the surveillance.  Agent Scully was also present during the search of the Sunlake Boulevard house.

Detective Cruz accompanied Detective Diaz during Perry's December 11 jail interview.  Detective Diaz had a Miranda waiver form and Detective Cruz

10

could not explain why Detective Diaz, who was in charge of the interview, did not ask Perry to write out his statement on the back of the <u>Miranda</u> form. Detective Cruz testified that Perry said during the interview that he bought the gun for $250. Defense counsel then impeached Detective Cruz with his suppression hearing testimony, in which he said that Perry told them he got the gun during a robbery. Detective Cruz also admitted that officers prepare police reports to record important information so their memory is accurate and that his own police report for December 11 did not mention that Perry had made any admissions.

On cross-examination, Detective Diaz admitted that he did not obtain a written statement from Perry during the December 11 jail interview, even though Perry was willing to give one. Although Detective Diaz explained that he failed to bring the proper forms, he also admitted that he could have had Perry write his statement out using paper and pen he had access to at the jail.

After the cross examination of Detectives Cruz and Diaz, the government called Detective Ralph Lazar with the Hillsborough County Sheriff's Office. Detective Lazar served on the area Alcohol Tobacco, Firearm and Explosives task force and led the investigation into the federal firearm charge. Detective Lazar presented the case to the United States Attorney's Office for prosecution. Detective Lazar did not do so as a favor to anyone. Detective Lazar did not know

11

or speak to Agent Scully until after the federal charge had been filed. The case was referred to Detective Lazar after the evidence was collected. Detective Lazar decided not to send the firearm for DNA or fingerprint testing because Perry had confessed to owning the firearm.

### 2. Perry's Trial Witnesses

Perry's defense counsel called Agent Scully as the first defense witness. Defense counsel examined Agent Scully at length attempting to show Agent Scully had both motive and opportunity to frame Perry for the firearm charge.

Agent Scully admitted that his 14-year-old daughter entered the house while the burglary was in progress and encountered the burglar. After receiving a call from his wife after the burglar left, Agent Scully became very upset and concerned for his daughter's safety. After reporting the burglary to the police, Agent Scully immediately went to the house, conducted a protective sweep with his gun drawn and investigated the crime scene. Agent Scully met with Detective Garcia the next day and offered him assistance in investigating the crime.

According to Agent Scully, the purpose of his DEA task force is to enforce narcotics laws. Although the DEA manual states that DEA task force members are not supposed to be assigned non-task force duties, in practice local law enforcement agencies sometimes gave their DEA task force members work that

was not drug-related. Agent Scully described his relationship with his task force agents, including Detective Cruz, as "close" and that he believed they "ha[d] his back."

Agent Scully admitted that he (1) became actively involved in the burglary investigation; (2) had a strong desire to see the burglar caught and prosecuted, (3) was absolutely certain that Perry was the burglar; (4) asked several of his DEA task force members, including Detective Cruz, to help find and arrest Perry on an unrelated outstanding warrant; (5) used DEA tracking devices to locate Perry; (6) went with other DEA task force agents to conduct surveillance of Perry and arrest him; (7) went with Detective Cruz and Tuttle to the Sunlake Boulevard house, where he hoped to recover some of his stolen property; (8) participated in a protective sweep of the house; and (9) asked Detective Cruz to participate in Detective Diaz's interview of Perry.

Agent Scully admitted he learned that officers, during the search, had found a firearm in the basement of the Sunlake Boulevard house. When defense counsel then sought to ask Agent Scully if he told Detective Garcia that he could have Perry prosecuted in federal court on a firearm charge, the government objected. The district court sustained the objection. In a sidebar, defense counsel argued (1) that the government had called Detective Lazar, who testified that the federal

13

firearm prosecution had nothing to do with the DEA; and (2) Detective Garcia's police report indicated that Agent Scully told him he would try to get Perry indicted on a federal firearm charge. When the district court asked the relevance of that evidence, defense counsel explained that Perry's defense was that law enforcement framed him for the firearm offense because "they [could not] convict him for the burglary." The district court stated that it had already given the defense a lot of leeway and that the evidence was not relevant.

Defense counsel then asked other questions about the burglary. Defense counsel had Agent Scully admit that on November 5, 2008 he had officers from the Hillsborough County Sheriff's Office return to his home to get additional fingerprints believed to belong to the burglar. However, the district court sustained the government's objections to defense counsel asking whether those fingerprints matched Perry's fingerprints and whether Agent Scully's daughter had identified Perry in a photographic line-up.

On cross-examination by the government, Agent Scully testified that he did not ask Detective Lazar or the federal prosecutor to bring the federal firearm charge against Perry and that he did not direct Detective Garcia's investigation into the burglaries. Agent Scully denied planting the gun, the bullets or the identification card at the Sunlake Boulevard house or instructing anyone else to do

14

so. Agent Scully also denied instructing anyone to fabricate Perry's confessions that he owned the firearm.

Defendant Perry next proffered testimony he expected to elicit from Detective Garcia about the burglary, including that: (1) aviation and canine units responded to the burglary of Agent Scully's home with no results; (2) an eyewitness came face-to-face with the burglary suspect, but was unable to identify Perry from photos; (3) there were other suspects for the series of burglaries; and (4) Agent Scully told Detective Garcia that he would assemble a team to prove that Perry committed the burglaries, have Detective Cruz assist in the investigation and try to obtain a federal indictment. Perry argued that this testimony showed bias and motive for Agent Scully and Detectives Cruz and Diaz to lie and could be used for impeachment.

The district court concluded that Garcia's proffered testimony about these details of the burglary investigation were irrelevant and would not be allowed. The district court stated that Perry "had accomplished whatever [he] wanted to accomplish" through his examination of Agent Scully about the burglary investigation and did not need this additional testimony.

Before deliberations, the district court gave the jury a limiting instruction as to the evidence of Perry's prior convictions, as follows:

During the course of the trial, you heard evidence of acts of the defendant which may be similar to those charged in the Indictment, but which were committed on other occasions. You must not consider any of this evidence in deciding if the defendant committed the acts charged in the Indictment. However, you may consider this evidence for other, very limited, purposes.

If you find beyond a reasonable doubt from other evidence in this case that the defendant did commit the acts charged in the Indictment, then you may consider evidence of the similar acts allegedly committed on other occasions to determine whether the defendant had the state of mind or intent necessary to commit the crime charged in the Indictment.

The jury found Perry guilty. Perry filed a motion for a new trial, which the district court denied. Perry appealed.

## II. DISCUSSION

### A.  Evidence From the Sunlake Boulevard House

Perry argues that the district court erred in denying his motion to suppress the evidence found in the Sunlake Boulevard basement.

Generally, the Fourth Amendment requires a search by law enforcement to be pursuant to either a warrant supported by probable cause or valid consent. United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005); United States v. Dunkley, 911 F.2d 522, 525 (11th Cir. 1990). A defendant cannot seek to suppress evidence unless he shows "that his Fourth Amendment rights were violated by the challenged search or seizure." United States v. Padilla, 508 U.S. 77, 81, 113 S. Ct. 1936, 1939 (1993). To meet this burden, the defendant must demonstrate that he

16

had a legitimate expectation of privacy in the areas searched. United States v. Lee, 586 F.3d 859, 864 (11th Cir. 2009), cert. denied, ___ S. Ct. ___, 2010 WL 1186198 (U.S. Apr. 26, 2010). When a defendant explicitly denies owning or relinquishes possession or control over an area to be searched, he cannot carry his burden to show an expectation of privacy. See, e.g., United States v. Sweeting, 933 F.2d 962, 964 (11th Cir. 1991); United States v. Cofield, 272 F.3d 1303, 1306-07 (11th Cir. 2001).[3]

Here, Perry denied living at the Sunlake Boulevard residence. Perry told Detective Garcia that he lived at an apartment on Memorial Highway and that he was only storing a couch in Tuttle's basement. Given these facts, the district court did not clearly err in finding that Perry failed to show an expectation of privacy in the Sunlake Boulevard residence and, thus, did not err in concluding that Perry lacked standing to assert a Fourth Amendment violation.

## B. Admission of Prior Convictions

Perry argues that the district court should have excluded evidence of his two

---

[3]"In reviewing a district court's ruling on a motion to suppress, we review findings of fact for clear error and the application of the law to those facts de novo." United States v. Martinelli, 454 F.3d 1300, 1306 (11th Cir. 2006). Thus, we review a district court's factual finding as to the subjective expectation of privacy for clear error, but review de novo its legal conclusion as to the objective reasonableness of the expectation of privacy. United States v. McKennon, 814 F.2d 1539, 1543 (11th Cir. 1987). In determining whether the defendant has demonstrated a legitimate expectation of privacy, we view the evidence in the light most favorable to the government, as it was the prevailing party in the district court. See United States v. Bennett, 555 F.3d 962, 965 (11th Cir.), cert. denied, 130 S. Ct. 64 (2009).

prior felony firearm-related convictions.

Under Federal Rule of Evidence 404(b), evidence of other crimes may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).[4] Prior bad acts evidence is subject to a three-part test for admissibility: (1) the evidence must be relevant to an issue other than the defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; and (3) the government must offer sufficient proof so that the jury could find that the defendant committed the act. United States v. Ellisor, 522 F.3d 1255, 1267 (11th Cir. 2008).[5]

In this case, Perry pled not guilty to being a felon in possession of ammunition, which placed in issue the element of his knowing possession and put the government to its burden to prove this element beyond a reasonable doubt. See United States v. Jernigan, 341 F.3d 1273, 1281 n.7 (11th Cir. 2003) (explaining

---

[4]Rule 404(b) states:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .
Fed. R. Evid. 404(b).

[5]We review admissions of Rule 404(b) evidence for abuse of discretion. Ellisor, 522 F.3d at 1267. Furthermore, evidence admitted in violation of Rule 404(b) is harmless when there is substantial evidence of the defendant's guilt. United States v. Chavez, 204 F.3d, 1305, 1317 (11th Cir. 2000).

that when a defendant pleads not guilty to being a felon in possession, he puts at issue his knowing possession). Further, Perry's defense at trial — that the loaded gun was planted by the police — particularly put in issue his knowledge of and intent to possess the loaded gun.

To show that Perry's possession of the loaded gun was knowing and intentional, the government introduced the prior convictions for armed burglary of a dwelling, in violation of Florida Statutes § 810.02(2)(b), and grand theft of a firearm, in violation of Florida Statutes § 812.014(2)(c)(3) (1995). Each of Perry's prior convictions involved the knowing possession of a firearm. This Court repeatedly has upheld the admission of prior convictions involving the possession of a firearm to prove the defendant's present knowing possession of a firearm. See, e.g., United States v. Taylor, 417 F.3d 1176, 1182 (11th Cir. 2005) (involving admission of prior conviction for felon in possession of a firearm); United States v. Gonzalez, 183 F.3d 1315, 1328 (11th Cir. 1999) (superseded by regulation on other grounds) (involving prior weapon possession conviction); see also United States v. Dickerson, 248 F.3d 1036, 1047 (11th Cir. 2001) (explaining that to establish relevance of other crimes evidence offered as proof of intent, "it must be determined that the extrinsic offense requires the same intent as the charged offense" (quotation marks omitted)). The district court properly conducted a Rule

19

403 balancing test and then concluded that the probative value of the firearms evidence outweighed any prejudicial effects. The district court also instructed the jury that the prior firearm-related convictions were introduced for a limited purpose. Accordingly, the district court did not abuse its discretion in admitting Perry's two prior firearm-related convictions as evidence of Perry's intent.[6]

## C. Perry's Defense

Perry contends that the district court deprived him of his Fifth and Sixth Amendment rights to present a complete defense by excluding the proffered testimony of Detective Garcia and certain testimony during his examination of Agent Scully.

We review a district court's exclusion of defense evidence at trial for an abuse of discretion. United States v. Todd, 108 F.3d 1329, 1331-32 (11th Cir. 1997). However, when the district court's evidentiary rulings rise to the level of depriving the defendant of his constitutional right to present a defense, such rulings amount to constitutional error. See Chambers v. Mississippi, 410 U.S. 284, 302-03, 93 S. Ct. 1038, 1049 (1973). A defendant's right under the Fifth and Sixth Amendments to present a defense "'is violated when the evidence excluded is

_____

[6]Perry also did not carry his "heavy burden" to show "an abuse of the court's broad discretion in determining" that the prior convictions were not too remote to be probative. See United States v. Matthews, 431 F.3d 1296, 1311-12 (11th Cir. 2005) (finding eight-year-old prior conviction not too remote) (quotation marks omitted); see also United States v. Lampley, 68 F.3d 1296, 1300 (11th Cir. 1995) (upholding admission of fifteen-year-old prior drug deals).

material in the sense of a crucial, critical, highly significant factor.'" <u>United States v. Hurn</u>, 368 F.3d 1359, 1363 (11th Cir. 2004) (quoting <u>United States v. Ramos</u>, 933 F.2d 968, 974 (11th Cir. 1991)). "In assessing a defendant's claims under the Fifth and Sixth Amendments to call witnesses in [his] defense," we first determine "whether this right was actually violated, [and] then turn to whether this error was 'harmless beyond a reasonable doubt' under <u>Chapman v. California</u>, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 12 L.Ed.2d 705 (1967)." <u>Id.</u> at 1362-63.

Perry contends the excluded evidence was necessary (1) to show law enforcement's motive for planting the firearm in the basement of the Sunlake Boulevard house and manufacturing his two confessions; (2) to challenge the credibility of the government's witnesses, Detectives Cruz and Diaz; and (3) to place the government's story of the events in a different light for the jury.

The problem for Perry is that the district court actually allowed Perry to introduce substantial evidence about the burglary to support his defense theory that Scully and the other officers planted the gun because they believed he was the burglar and wanted to make sure he was caught and prosecuted.[7] For example,

---

[7]There is some question as to whether the burglary evidence against Perry was weak (as Perry claims) given that: (1) a Starbucks surveillance video showed the burglary suspect, who resembled Perry, entering a taxi; (2) the taxi drove the suspect to the apartments where Perry's girlfriend lived; (3) the U-Haul truck was seen by law enforcement parked at both Perry's girlfriend's apartment and at the Sunlake Boulevard home; and (4) items from the burglary were found in the Sunlake Boulevard basement Perry rented. But for purposes of this argument, we merely assume the evidence linking Perry to the burglary was weak as Perry claims.

Perry was able to show, inter alia, that: (1) that the burglary occurred at Agent Scully's house while his daughter was at home; (2) his wife called him and Scully was very upset; (3) Agent Scully adamantly believed Perry was the burglar, had feelings of ill-will for Perry and wanted to see Perry caught and prosecuted; (4) contrary to agency policy and custom, Agent Scully became actively involved in the state burglary investigation and committed DEA resources and personnel in order to arrest Perry; (5) only DEA task force members, including Agent Scully, conducted surveillance on Perry and arrested him; (6) DEA task force members loyal to Agent Scully were involved in the search of the Sunlake Boulevard basement and one of them, Detective Cruz, claimed to have found the loaded gun with Perry's identification card; (7) Detective Cruz participated in one of the interviews in which Perry confessed to owning the gun; (8) there is no written record of either confession; (9) no physical evidence, such as DNA or fingerprints, linked Perry to the loaded firearm; and (10) no eyewitness testimony placed the loaded firearm in Perry's physical possession. At closing argument, Perry's attorney specifically argued that Agent Scully believed Perry burglarized his home, wanted to prosecute Perry for the burglary, and then directed the investigation against Perry. Given the substantial evidence that was actually admitted, Perry arguably has not shown the additional motive evidence was so "crucial, critical, or

22

highly significant" to Perry's defense that its exclusion actually rose to the level of a constitutional violation.  See Ramos, 933 F.2d at 974.

However, we need not reach that constitutional issue because any alleged error was harmless beyond a reasonable doubt.  See Wyzykowski v. Dep't of Corrs., 226 F.3d 1213, 1218 (11th Cir. 2000) (explaining that the court should "not pass on questions of constitutionality . . . unless such adjudication is unavoidable" (quotation marks omitted)).  Detectives Cruz and Diaz found the loaded gun with Perry's identification in the Sunlake Boulevard basement Perry rented from Tuttle.  Perry confessed twice to owning that gun.  Despite extensive cross-examination, the jury credited the testimony of Detectives Cruz and Diaz and Perry's confessions and rejected the defense's theory of a set up.  We cannot say there is a reasonable possibility that the additional motive evidence would have changed the jury's verdict in this case.   See Chapman, 386 U.S. at 24, 87 S. Ct. at 828 (explaining that the harmless "beyond a reasonable doubt" standard applies for alleged constitutional errors); see also Neder v. United States, 527 U.S. 1, 18, 119 S. Ct. 1827, 1838 (1999) (explaining that the Chapman standard asks whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error").

For all these reasons, we affirm Perry's conviction.

23

**AFFIRMED.**