[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13217
_____

D.C. Docket No. 8:11-cr-00324-VMC-TGW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDUARDO BLANCHET,

Defendant-Appellant.

_____

No. 12-13256
_____

D.C. Docket No.  8:11-cr-00324-VMC-TGW-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL GUILLAN,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(May 21, 2013)

Before HULL and ANDERSON, Circuit Judges, and SCHLESINGER,[*] District Judge.

PER CURIAM:

Defendants Eduardo Blanchet and Daniel Guillan appeal their convictions and 36-month sentences of imprisonment for (1) one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and (2) five counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. After review and oral argument, we affirm both Defendants' convictions and sentences.

## I.  BACKGROUND

Defendants Blanchet's and Guillan's convictions arise out of their company's procurement of a $100 million, small business set-aside contract with the federal government in 2007. The contract was for the provision of foreign language instruction services to the United States Special Operations Command ("SOCOM"). The core of the fraud in this case is that Blanchet and Guillan's company did not meet the necessary federal standards to be considered a small business. Both Defendants participated in misrepresenting to or concealing from

_____

[*]Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

the government material facts about their company's affiliation with another, larger company, both in the initial bid and during the government's later investigation.

On February 13, 2012, a jury trial began as to both Blanchet and Guillan, and at the close of the trial, the jury found Blanchet and Guillan guilty on all six counts. We recount the trial evidence, which included extensive documentary and testimonial evidence that we construe in the light most favorable to the jury's guilty verdict, in setting out the essential facts of this case.

## A.    The 2002 Contract & BIB Consultants, Inc.

In September 2002, SOCOM awarded to BIB Consultants, Inc. ("BIB"), a contract for the provision of foreign language and cultural training to military personnel (the "2002 Contract"). Defendant Blanchet and his wife, Silvia Mira, formed BIB in June 1996, and each owned half of the company's shares at the time of formation. At the time BIB was awarded the 2002 Contract, Defendant Blanchet was the president of BIB while Defendant Guillan served as BIB's vice-president and registered agent, and both Defendants participated in the negotiations with SOCOM on BIB's behalf.[1] This 2002 Contract extended for a period of five years and had a ceiling of $50 million.

---

[1] In 2003, Guillan and his wife assumed positions as president and vice-president of BIB and each received 1,000 shares of BIB stock. Ostensibly, this change occurred in connection with a contract award that is not the subject of this appeal. That contract required that the company that obtained the contract have officers who were U.S. citizens. Guillan and his wife were U.S. citizens, while at the time of the award, Blanchet and Mira were non-citizens. On January 1, 2006, Guillan and his wife stepped down from their positions as officers of BIB and

Pursuant to a decision made by SOCOM's contracting officer, who for this 2002 Contract was Karene Spurlin, SOCOM designated the 2002 Contract as a "small business set-aside." To promote the growth of small businesses, SOCOM contracting officers had the discretion to designate certain contracts as being exclusively open for bid and performance by small businesses, with the small businesses being required to self-certify that they met certain criteria regarding their size, ownership, and affiliations with other business entities. After the business self-certified that it met the small-business requirements, the contracting officer would review the bid for any irregularities. If the contracting officer questioned the bid, she could refer the matter to the Small Business Administration ("SBA") for further investigation. As a result of BIB's performance under the 2002 Contract, BIB became too large to obtain subsequent small business set-aside contracts from SOCOM.

To obtain working capital and to enable BIB to perform under the 2002 Contract, Blanchet obtained a "factoring" credit arrangement with a local central Florida bank, BankFirst. Under this arrangement, which lasted for approximately one year, BankFirst received an assignment of BIB's right to payment under the 2002 Contract and, in exchange, BankFirst loaned money to BIB. The BankFirst-BIB loan was repaid as SOCOM made payments under the 2002 Contract.

---

Blanchet, Mira, and Luke Farkas, a BIB employee to whom Guillan's wife had sold all of her BIB stock, became BIB's sole officers.

4

**B.      Formation and Initial Organization of MiLanguages**

After it was awarded the 2002 Contract, BIB began providing foreign language training at various military installations.  At Fort Campbell, Kentucky, BIB subcontracted its contractual foreign language training obligations to Berlitz International.  At some point during the 2002 Contract term, SOCOM informed Blanchet or Guillan that it was dissatisfied with Berlitz's performance at Fort Campbell.

In September 2004, Guillan formed a new company called MiLanguages. Guillan initially owned all of MiLanguages's stock and was the company's president and registered agent.  Guillan later signed a stock purchase and sale agreement granting Blanchet and Blanchet's wife, Silvia Mira, the right to purchase MiLanguages's stock.  It is unclear whether Blanchet or his wife ever executed this agreement, however.

On December 27, 2004, MiLanguages entered into a subcontract with BIB under which MiLanguages agreed to take over the provision of foreign language services at Fort Campbell as of January 1, 2005.  Blanchet signed the subcontract on BIB's behalf and Guillan signed the subcontract for MiLanguages.

On January 4, 2005, MiLanguages opened an account at BankFirst. Blanchet and Guillan were the only authorized signatories for MiLanguages's

5

BankFirst account.  The first deposit into this account was a $50,000 check from BIB, and BIB also provided overdraft protection on this account.[2]

In November 2006, Blanchet contacted attorney Ralph Hadley, III, who had previously provided legal services for BIB and Blanchet—both personally and related to Blanchet's businesses.  At this time, Blanchet was serving as the president of BIB and the Director of Government Contracting for MiLanguages, while Guillan owned MiLanguages and was BIB's Director of Government Contracting.  Although Hadley was not familiar with the exact particulars of the relationships between BIB, MiLanguages, and the Defendants or the details of the 2002 Contract, Hadley was generally aware that MiLanguages did subcontracting work for BIB.

In an e-mail, Blanchet requested that Hadley draft an employment contract between MiLanguages and Guillan, despite the fact that Guillan was the current owner of MiLanguages.  This employment contract was contingent on MiLanguages obtaining a future contract from SOCOM.  In the e-mail, Blanchet asked Hadley whether BIB or MiLanguages should sign the contract, "considering the legal situation" between the two business entities and in light of the fact that "in reality [BIB] is the one, but [Guillan] will be hired by MiLanguages."  Essentially, Hadley did not understand why Blanchet was writing to him about a

---

[2]MiLanguages later repaid a $50,000 sum to Blanchet, with a check signed by Guillan, on December 5, 2008.

contract between Guillan and a company Guillan owned, but he "assume[d] [it was] because that was a discussion that the two of them had together between themselves. . . . They had private meetings and discussions to which [he] was not privy." When Hadley drafted the employment contract between MiLanguages and Guillan, Hadley billed BIB for the work he did on MiLanguages's behalf.

## C.    MiLanguages Transferred to a New Owner

Around this same time—the later months of 2006—the Defendants discussed with Hadley their desire to find someone with a strong foreign language and teaching background to head up MiLanguages and assist MiLanguages in bidding on future SOCOM contracts. Hadley recommended Edward Borsoi, a retired college professor whom Hadley knew and who lived nearby. After discussing the Defendants' request with Borsoi, Hadley arranged for the Defendants and Blanchet's wife, Mira, to meet with Borsoi at Hadley's office.

At this meeting, Hadley explained to Borsoi that the Defendants "had a business of providing foreign language instruction and that they had been very successful," but that their success led to their business growing too big to obtain new government contracts. Consequently, "the only way to apply for the [g]overnment contract would be for a new company to apply or a new restructuring of the old company," and Hadley asked Borsoi if he would be willing to have the stock shares of the new company placed in his name. Borsoi agreed to become the

7

sole stockholder and president of MiLanguages in exchange for a monthly stipend of $1500, but beyond accepting this role, Borsoi did not provide money or other consideration to Guillan in exchange for all of the shares of MiLanguages. Borsoi stated that he agreed to take on this role because he "was a retired guy. And retired people look for things to do. . . . [he] thought [he] would learn something. . . . it looked like a mutually . . . beneficial arrangement." At the meeting, neither of the Defendants asked Borsoi about his background or qualifications.

Hadley drew up the necessary paperwork and Borsoi signed it, and effective January 1, 2007, Borsoi became the owner of MiLanguages via a stock transfer from Guillan. However, Borsoi was not involved in the day-to-day operations of MiLanguages, could not sell his MiLanguages stock, and would sign documents for MiLanguages that were presented to him without really reading them. Borsoi did not consider himself to be the actual owner of MiLanguages, as he did not have his own office at MiLanguages, never spent any of MiLanguages's money or drew on the company's bank account. Neither Blanchet nor Guillan asked for Borsoi's permission to draw on MiLanguages's line of credit. In addition, Borsoi did not know how many, if any, contracts MiLanguages entered into during his tenure as president. The business decisions and "all the operations" for MiLanguages were handled by either Blanchet or Guillan, including subcontracting and personnel decisions.

8

**D.     MiLanguages's Bid for the 2007 SOCOM Follow-On Contract**

The 2002 Contract between BIB and SOCOM was scheduled to expire in 2007, and as noted previously, BIB had grown too large to obtain future small business set-aside contracts from SOCOM.  In light of the expiring 2002 Contract, Defendant Guillan hired Starr Solutions to assist MiLanguages in putting together a bid for a 2007 follow-on contract likely to be offered by SOCOM (the "2007 Contract").[3]  Vicky Strycharske, the owner of Starr Solutions, had assisted BIB with its bid for the 2002 Contract and had performed other bid and proposal-writing work for BIB and Berlitz International since 2002.

In the early stages of the bid-development process, Strycharske suggested that both BIB and MiLanguages prepare to submit bids on the 2007 Contract because SOCOM had not determined whether the 2007 Contract was going to be a small business set-aside.  However, Strycharske and her company were hired by MiLanguages, and Guillan made it clear that Strycharske was working for MiLanguages, a company that he told Strycharske that he owned.  Guillan signed the checks paying Starr for work she performed on MiLanguages's behalf.  Strycharske never had any interaction with Borsoi, although at one point while she

---

[3]The term "follow-on contract" was used by SOCOM and the parties in this appeal to describe a situation where a prior contract term was expiring, but SOCOM wanted to continue to receive services.

9

was still working for MiLanguages, Guillan told her that Borsoi owned the company.

After Starr was retained by MiLanguages, Blanchet met with Strycharske and expressed to her that "[h]e was angry that [Guillan] thought that MiLanguages was his company" and that "he had been very good to [Guillan], that he'd made him a wealthy man. . . . He also said that it was . . . his [i.e., Blanchet's] money." Blanchet did not specifically indicate why he was upset about MiLanguages or Guillan during that meeting, but Strycharske understood his anger to be directed at an issue about "the ownership of MiLanguages." Guillan continued to serve as the Director of Government Contracting for BIB while MiLanguages was preparing to bid for the 2007 Contract.

During this pre-bid phase, Guillan asked Spurlin (who was still serving as SOCOM's contracting officer) whether the 2007 Contract, like the 2002 Contract, would be set aside for small businesses. Spurlin told Guillan that once SOCOM designated a contract as a small business set-aside, "it normally stays set-aside for small business." Guillan also asked whether BIB would be eligible to bid on the 2007 Contract if the contract was a small business set-aside, and Spurlin told him BIB would not be eligible because BIB "would have exceeded the small business dollar threshold."

In November 2006, Blanchet and Guillan both attended SOCOM's "industry day," which was a gathering of potential bidders for the 2007 Contract. Blanchet represented BIB, and Guillan represented MiLanguages at this meeting.

On January 8, 2007, SOCOM released online a "pre-solicitation notice" for the 2007 Contract. This notice indicated that the forthcoming contract was for the provision of foreign language training and would be "a hundred percent set-aside for small business . . . . and the size standard is $6.5 million," meaning that companies that wanted to bid on the contract could not do more than $6.5 million in business either that year or in total. The notice also indicated that the contract would extend for "a base year with four option periods" and have a ceiling of $100 million.

After SOCOM issued this notice, in early 2007 Strycharske began preparing MiLanguages's bid for the 2007 Contract. On January 25, 2007, Guillan sent an e-mail about MiLanguages's bid to "[the] whole team," including Strycharske (but not Borsoi). In this e-mail, Guillan indicated that because the 2007 Contract was set aside for small businesses, "MiLanguages will lead," i.e., would be the prime contractor, and that other affiliated companies would be subcontractors.[4] In

---

[4]According to Spurlin's trial testimony, under the federal regulations governing small business set-aside contracts, a small business that was awarded such a contract could legally subcontract out up to 49 percent of the contract work to a larger company.

11

preparing MiLanguages's bid for the 2007 Contract, Strycharske coordinated with Blanchet, Guillan, and other team members.

On February 26, 2007, MiLanguages submitted its bid for the 2007 Contract to SOCOM. In its bid, MiLanguages confirmed that it was "a small business." MiLanguages's bid also stated that (1) several current or former BIB or Berlitz employees would work for MiLanguages if MiLanguages was awarded the 2007 Contract; and (2) BIB and Berlitz would be among the subcontractors MiLanguages was planning to hire.  During the pendency of its bid, MiLanguages clearly and repeatedly identified Guillan as its Director for Government Contracting and primary contact person concerning the bid, despite the fact that Guillan would not officially assume his role as Director until July 16, 2007.

A month after MiLanguages submitted its bid, SOCOM sent MiLanguages a letter, addressed to Borsoi, explaining that MiLanguages was selected to move past the initial round of consideration and that there were potential weaknesses in MiLanguages's bid that SOCOM would like to see addressed by April 11, 2007. After MiLanguages complied with SOCOM's request to modify its bid, SOCOM sent Borsoi another letter inviting MiLanguages to make an "oral proposal" or "pitch" on April 18, 2007.

Strycharske worked with Guillan to prepare for the April 18 pitch meeting with SOCOM.  Guillan, along with Luke Farkas and David Wedel (two

12

BIB/Berlitz employees who were planning to transition to MiLanguages in the event that MiLanguages was awarded the contract), gave the oral presentation at SOCOM on April 18.

On May 8, 2007, after reviewing all of the bids, SOCOM conditionally recommended that the 2007 Contract be awarded to MiLanguages.  SOCOM indicated in the recommendation that MiLanguages had identified itself as a small business in the federal Central Contractor Register and was qualified to obtain and perform the contract.

Around the time that SOCOM conditionally recommended that MiLanguages receive the 2007 Contract, Blanchet approached BankFirst to inquire about opening a line of credit for MiLanguages to "assist with an upcoming [g]overnment contract." BankFirst's managers understood that (1) BIB could not receive the 2007 Contract because it had "grown too big after the [2002] [C]ontract"; (2) the 2007 Contract would be "housed under a new company called MiLanguages"; (3) the Defendants would be MiLanguages's "primary operators" even though Borsoi technically owned MiLanguages "on paper"; and (4) Blanchet would be the "hands-on" manager of MiLanguages.  In addition, although the BankFirst managers knew Borsoi owned and was president of MiLanguages, they never met him or transacted MiLanguages business with him.

13

## E.    The SBA Size Determination

In June 2007, two unsuccessful bidder companies protested SOCOM's conditional award of the 2007 Contract to MiLanguages, asserting in their protests that MiLanguages was not a small business.  Although the two protesting companies had been eliminated from consideration for unknown reasons during SOCOM's review of all the bids, SOCOM withheld the award of the 2007 Contract to MiLanguages in order to have a "formal size determination" performed.  Contracting Officer Spurlin referred the protests and the request for a size determination to the regional Small Business Administration ("SBA") office in Atlanta, Georgia, because it was the SBA, not SOCOM, that would make the ultimate determination regarding MiLanguages's size.[5]

Guillan contacted Strycharske about the size protests, and Strycharske recommended that MiLanguages retain an attorney, Amy O'Sullivan, to represent it during the SBA size determination process.  Strycharske reached out to O'Sullivan on MiLanguages's behalf, with Guillan's consent, and O'Sullivan agreed to represent MiLanguages.

---

[5]An SBA size determination is a broad-based, adversarial, and "fact specific process," similar to litigation, that is initiated when a size protest is filed.  During the size determination, the SBA considers numerous factors, including, inter alia: ownership and control of the company; compensation structure; the number of employees; financial, managerial, employment, or other affiliations with other companies; the company's use of subcontracting; and the individuals who prepared the bid.  In addition to these specifically enumerated factors, the SBA also considers "all of the relevant facts under . . . a totality of the circumstances test."  A company's size is set at the time it files its bid.

14

Although Blanchet informed Borsoi about the size protests, Borsoi was not involved in hiring O'Sullivan and he "never heard a word from anyone about . . . the response to the [protests]." Borsoi also did not remember signing documents or knowing the content of the documents that MiLanguages submitted during the size determination, although his signature was on several of MiLanguages's submissions.

In addition, attorney Hadley was not familiar with the SBA regulations governing small businesses, or with government contracting in general, and Hadley did not substantively participate in the size determination process either (although he was kept informed by Blanchet and Guillan). Hadley's involvement in the size determination process was primarily administrative: he reviewed O'Sullivan's retainer and helped set up her relationship with MiLanguages, arranged for O'Sullivan's bills to be passed through his firm to MiLanguages, and helped MiLanguages respond to O'Sullivan's requests for information to send to the SBA.

During the SBA size determination, attorney O'Sullivan's primary contact point was Guillan, who provided her with much of the information that she eventually transmitted on MiLanguages's behalf to the SBA. O'Sullivan also communicated with Strycharske, Hadley, and Defendant Blanchet to obtain information to respond to the SBA. O'Sullivan understood, from her correspondence with the Defendants, that Blanchet "had no role in MiLanguages"

15

and that Guillan "wanted to continue doing . . . language instruction but he didn't want to be involved with the day-to-day responsibilities of running a company." Moreover, Guillan told attorney O'Sullivan that MiLanguages was "exclusively in charge of preparing" its bid (in consultation with Strycharske) and did not receive financial or other assistance from BIB or any other company. Guillan also helped draft and signed several declarations that would ultimately be filed in response to the SBA's inquiry.

Steve Smithfield was the SBA employee responsible for handling the size determination. On June 20, 2007, Smithfield sent MiLanguages a letter, addressed to Borsoi and Guillan, informing MiLanguages of the protest and asking MiLanguages to provide certain information to aid in the size determination.

On June 26, 2007, MiLanguages submitted an SBA Form 355 in response to the SBA's inquiry. Form 355, which is signed under penalty of perjury, includes "a laundry list of questions" about ownership, control, affiliations, and other factors the SBA takes into account in making a size determination. Because the SBA must make a decision as to a company's size within a short period of time (usually within 10 days) and it cannot perform its own independent investigation, the SBA must rely on the information self-reported by the company that is the subject of the protest in making the size determination.

16

In its Form 355, MiLanguages listed BIB as an "alleged, acknowledged, or possible affiliate."  MiLanguages also represented, <u>inter alia</u>, that:

(1) MiLanguages's owners, officers, directors, key employees, and supervisors had never been employed by or performed similar work for BIB;

(2) BIB had not helped MiLanguages prepare its bid;

(3) the only past or current financial obligations between MiLanguages and BIB were exclusively those financial obligations, including "Accounts Payable [and] Accounts Receivable," that were ongoing as a result of MiLanguages's status as a subcontractor on the 2002 Contract;

(4) no individuals who were not owners, officers, directors, employees, partners, or principal stockholders of MiLanguages had signed (or were expected to sign) documents to facilitate MiLanguages's ability to receive indemnifications or credit guarantees;

(5) BIB had not helped MiLanguages arrange subcontractors for the follow-on contract;

(6) MiLanguages had not discussed with BIB "the specific terms or conditions" of the 2007 Contract "prior to bid opening"; and

(7) BIB would suffer no financial impact if MiLanguages were terminated from the 2007 Contract.

One day after submitting the Form 355 for MiLanguages, attorney O'Sullivan further responded to the SBA's inquiry by forwarding additional information and a declaration by Guillan to the SBA.  Guillan's declaration was primarily focused on the relationship between BIB and MiLanguages, because the protesting companies had raised a question as to the companies' affiliations with each other.

17

In his declaration, Guillan stated, <u>inter alia</u>, that he had sold all of his MiLanguages shares to Borsoi in an "arm's length" transaction that was effective January 1, 2007.  The sale "was for fair and reasonable consideration" and after that date, Guillan did not stay on as an employee with MiLanguages.  Guillan explained that he sold his shares to Borsoi in order "to continue working in the [language instruction] industry without the additional oversight and executive responsibilities."

Guillan also represented that on the date MiLanguages filed its bid for the 2007 Contract and self-certified that it was a small business, Guillan's responsibilities as a "facility security officer" for MiLanguages involved "purely administrative responsibilities … and [gave him] no control over the corporate governance or decisionmaking of MiLanguages."  In addition, the declaration stated that "MiLanguages does not, and never has, received financial assistance of any kind from BIB."

On June 29 and July 6, 2007, the SBA's Smithfield sent attorney O'Sullivan e-mails asking her to provide additional information about: (1) Guillan's marital status (including whether Guillan and his wife had helped Borsoi prepare MiLanguages's bid), (2) Guillan's income; (3) Guillan's employment history and relationships with BIB and MiLanguages; (4) Borsoi's qualifications and compensation for the work he performed for MiLanguages; (5) whether

18

MiLanguages and BIB shared office space or other facilities; and (7) whether or how much work under the 2007 Contract would be performed by BIB as a subcontractor versus MiLanguages as the prime contractor. O'Sullivan forwarded these e-mails to Blanchet and Guillan during her attempts to obtain the information necessary to answer Smithfield's inquiries.

O'Sullivan responded piecemeal to Smithfield's requests, and her responsive materials included a second declaration by Guillan. In this second declaration, Guillan represented that he had agreed to serve as MiLanguages's facility security officer, pursuant to a consulting agreement, until MiLanguages could find another person to take over the job. Guillan's consulting services were "minimal in nature and generally require[d] less than one hour per week," and he had not "received any compensation from MiLanguages pursuant to [his] consulting agreement." Guillan's declaration also stated that since April 2005, MiLanguages and BIB had not shared office space. At trial, the SBA's Smithfield testified that "the way [MiLanguages's response] was written," he did not believe that MiLanguages was "dependent upon" Guillan.

On July 10, 2007, in response to concerns raised internally at the SBA about Guillan's role in preparing MiLanguages's bid, Smithfield sent O'Sullivan another e-mail asking for details about Guillan's role in putting MiLanguages's bid together and what experience Borsoi had in bidding on government contracts.

19

Because the SBA's 10-day size determination deadline was approaching, Smithfield asked O'Sullivan to respond that day.

In response, O'Sullivan sent Smithfield an e-mail stating that although she was still trying to locate Guillan or Borsoi to obtain further details, MiLanguages had been responsible for preparing its own bid for the 2007 Contract, and that Borsoi had hired Strycharske to advise MiLanguages. O'Sullivan also inquired whether her response was sufficient. Smithfield responded, "I think that covers it." Meanwhile, O'Sullivan sent Blanchet, Guillan, and Hadley a copy of her responses to Smithfield's inquires, but they did not contact her to correct any information in the response.

In July 2007, Blanchet sent an e-mail to Spurlin, who at that point was no longer serving as SOCOM's contracting officer. Blanchet forwarded to Spurlin some of the Smithfield–O'Sullivan correspondence, complaining about SBA's questions and making a "worried request" for assistance. Because she was no longer with SOCOM, Spurlin could not provide Blanchet any assistance.

The SBA's Smithfield ultimately recommended, based on the information provided by O'Sullivan on MiLanguages's behalf, that MiLanguages be considered a small business and that the size protest be denied. In his recommendation, dated July 10, 2007, Smithfield analyzed a number of factors that contributed to the size determination under the "totality of the circumstances" rule.

20

These factors were that: (1) MiLanguages was not newly organized, as it had been in business for more than three years; (2) MiLanguages was capable of performing contracts and had performed some contracts without BIB's assistance; (3) Guillan was not an owner or officer of either MiLanguages or BIB, and he could not exercise control over either company; (4) MiLanguages had received no financial assistance from BIB; (5) there was no overlapping ownership between MiLanguages and BIB; and (6) MiLanguages had received no technical assistance in preparing its bid for the 2007 Contract from BIB or Guillan.

## F.    Award of 2007 Contract to MiLanguages

Following the SBA's resolution of the size protest, on July 13, 2007, Charles Bright, who was then serving as SOCOM's contracting officer, signed the 2007 Contract with MiLanguages.  Bright sent MiLanguages a letter confirming the award and explaining that SOCOM would schedule a post-award conference regarding the contract.  SOCOM confirmed the award of the 2007 Contract to MiLanguages after the SBA concluded that MiLanguages satisfied the small business criteria; without the SBA's confirmation, SOCOM would have been unable to award the contract to MiLanguages.  Although Borsoi's signature appeared on the 2007 Contract for MiLanguages, SOCOM corresponded with Guillan to obtain Borsoi's signature.  On July 16, 2007, Guillan became MiLanguages's Director of Government Contracting.  On MiLanguages's behalf,

21

Guillan, along with Borsoi and another individual, attended the post-award conference with SOCOM personnel on August 1, 2007.

On August 15, 2007, BankFirst approved a $600,000 line of credit for MiLanguages, which Defendant Blanchet had requested several months earlier. When BankFirst approved the line of credit, it did so in part because it understood that Blanchet and his wife owned the holding company that owned the building in which MiLanguages was located. Although Borsoi's signature appears on the initiating documents for the line of credit, Blanchet personally guaranteed the line, and BankFirst considered it important to its relationship with MiLanguages that Blanchet had an exclusive stock purchase agreement with Borsoi, because "it was important to know that [Blanchet] in our mind had control of the company."

In accepting Blanchet as the guarantor, BankFirst also made an exception to its underwriting policy, which ordinarily would have required MiLanguages's putative owner, Borsoi, to be the guarantor. Here, however, BankFirst recognized that Borsoi "didn't add financial strength to the credit." BankFirst made the exception because MiLanguages's line of credit would be secured by both Blanchet's guarantee and ample collateral, the loan involved a federal government contract, Blanchet had over $2 million in other accounts at BankFirst, and because Blanchet was "an integral part of the business operations."

22

**G.    Payments Made to MiLanguages under the 2007 Contract & Seizure of MiLanguages's BankFirst Operating Account**

Following SOCOM's award of the 2007 Contract to MiLanguages, and consistent with MiLanguages's bid for that contract, Daniel Guillan and other BIB employees who had committed to joining MiLanguages resigned as employees of BIB and became employed by MiLanguages.

In performing under the 2007 Contract, MiLanguages was permitted to submit invoices to SOCOM every two weeks. SOCOM paid MiLanguages through the Defense Finance and Accounting Service ("DFAS"). To generate a payment, DFAS required three pieces of information: a valid contract signed by a contracting officer (here, the 2007 Contract), an invoice or billing statement from MiLanguages, and a receipt and acceptance from SOCOM indicating that the work had been performed. Some 99.5 percent of all DFAS payments to defense contractors are made by electronic funds transfer. DFAS payments to MiLanguages under the 2007 Contract originated at the DFAS office in Columbus, Ohio, and were then transmitted through the Federal Reserve Bank in Atlanta, Georgia, before being transmitted again to MiLanguages's BankFirst account in central Florida.

During the term of the 2007 Contract, SOCOM paid MiLanguages about $98.6 million through DFAS. The payments included electronic funds transfers to MiLanguages's operating account on July 15, 2010 ($141,246.99), November 10,

23

2010 ($184,549.68), December 2, 2010 ($208,507.66), December 16, 2010 ($283,886.37), and February 24, 2011 ($366,013.07). These transfers formed the basis of the five substantive wire fraud charges against each Defendant.

From 2006 through 2010, MiLanguages paid Guillan about $4.4 million in base pay and other compensation. And, between 2007 and 2010, MiLanguages paid about $7.4 million to Blanchet or to accounts, entities, or interests controlled by him. Moreover, before and after the follow-on contract, and for a variety of putative purposes, large sums of money moved between MiLanguages's accounts (including the line of credit guaranteed by Blanchet) and accounts controlled by Blanchet, Guillan, their families, and other business entities controlled by those individuals. Borsoi, who remained the putative owner and president of MiLanguages during the duration of the 2007 Contract term, received a total of only $63,000, paid in a series of monthly $1,500 checks signed by Guillan.

The resolution of the SBA size protest was not the end of the government's investigation into MiLanguages. At some point during the 2007 Contract term, the Defense Criminal Investigative Service began reviewing SOCOM's award of the 2007 Contract to MiLanguages. This investigation, which was ongoing during MiLanguages's performance of the 2007 Contract, culminated in the issuance of a seizure warrant for MiLanguages's operating account at BankFirst in July 2010.

24

The Defendants and the government agreed to the following stipulation concerning the government's seizure of MiLanguages's operating account at BankFirst, which was read to the jury at the Defendants' trial:

> On July 14th, 2010 a seizure warrant was authorized relating to the MiLanguages operating account with BankFIRST. . . .On July 15th, 2010 that seizure warrant was executed against the MiLanguages operating account.  After the seizure warrant was executed, the Department of Defense, SOCOM, continued to pay money into the MiLanguages operating account to fund MiLanguages['s] performance under the SOCOM contract which is the subject of this action.  MiLanguages continued to perform under the SOCOM contract at issue in this action until October 23rd, 2011.

After the seizure warrant was executed, BankFirst elected to keep MiLanguages's account open "[b]ased upon a number of circumstances." BankFirst was not compelled by the government to keep the account open.

## II. PROCEDURAL HISTORY

Blanchet and Guillan were charged in a six-count indictment filed on June 21, 2011.  The indictment charged both Defendants with conspiring to defraud the United States and to commit wire fraud against the United States, in violation of 18 U.S.C. § 371 (Count 1), and five substantive counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 2 through 6).  The substantive wire fraud charges were based on the five individual wire transfers that occurred on July 15, November 10, and December 2 and 16, 2010, and February 24, 2011.  These

25

transfers were initiated by SOCOM as payments to MiLanguages for its performance under the 2007 Contract.[6]

The Defendants were tried jointly in a trial that spanned several weeks.  At the conclusion of the trial, the jury returned guilty verdicts as to Defendants Blanchet and Guillan on all six counts of the indictment.  At a separate sentencing hearing, the district court imposed identical 36-month sentences of imprisonment on each Defendant.  Both Defendants then appealed.

## III.  DISCUSSION

**A.    Denial of the Defendants' Joint Motion for Judgment of Acquittal—Sufficiency of the Evidence**

The Defendants argue that the district court erred in denying their joint motion for judgment of acquittal because (1) on the conspiracy counts, no reasonable trier of fact could have found that they formed an agreement to achieve an unlawful objective, and (2) on the wire fraud counts, no reasonable trier of fact could have found that they engaged in wire transmissions for the purpose of executing a scheme to defraud.[7]

---

[6]The indictment also contained separate forfeiture allegations that are not at issue in this appeal.

[7]We review de novo the district court's denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the jury's verdict. United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002).  To uphold the denial of the motion, we must determine "that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt."  Id. (internal quotation mark omitted).  "It is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not

26

In this case the evidence, taken in the light most favorable to the government, reveals that Defendants Blanchet and Guillan willfully conspired with to obtain the 2007 Contract through fraud and to misrepresent MiLanguages's affiliation with BIB during the SBA size determination. The evidence also demonstrates that the Defendants knowingly caused to be sent and received the proceeds from their illicitly-obtained contract over the interstate wires, through MiLanguages's account at BankFirst, on each of the five dates charged in the indictment. We now explain how the evidence supports the Defendants' convictions.

### 1.    Sufficiency of the Evidence: Conspiracy Count

To obtain a conspiracy conviction under 18 U.S.C. § 371, "the [g]overnment must prove (1) that an agreement existed between two or more persons to commit a crime; (2) that the defendant[s] knowingly and voluntarily joined or participated in the conspiracy; and (3) a conspirator performed an overt act in furtherance of the agreement." United States v. Ndiaye, 434 F.3d 1270, 1294 (11th Cir. 2006). The existence of a conspiracy may be proven by circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of the scheme." United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005) (internal quotation marks omitted). "Direct evidence of an agreement to

---

whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006).

27

join a criminal conspiracy is rare, so a defendant's assent can be inferred from acts furthering the conspiracy's purpose. The government is not required to prove that each alleged conspirator knew all the details of the conspiracy; it is enough to establish that a defendant knew the essentials of the conspiracy." United States v. Mulherin, 710 F.2d 731, 738 (11th Cir. 1983) (internal citations omitted).

The alleged objects of the Defendants' conspiracy were (1) to defraud the United States, specifically SOCOM, in connection with MiLanguages's bidding on and receiving the 2007 Contract, (2) to defraud the United States, specifically the SBA, in connection with the SBA's size determination, and (3) to commit wire fraud against the United States. The indictment further alleged that the conspiracy began as early as in or about August 2004 and continued at least through in or about July 2007.

Here, both direct and circumstantial evidence, viewed in the light most favorable to the verdict and making all reasonable inferences and credibility choices in the government's favor, amply supports the jury's verdict that the Defendants agreed to engage in a scheme to defraud the United States and commit wire fraud against the United States. The evidence demonstrates that both Defendants were experienced government contractors who had played key roles in obtaining and performing BIB's 2002 Contract. They knew the mechanics of the government contract bid and procurement process, and they knew that as a result

28

of its performance of the 2002 Contract, BIB was too large to receive future small business set-aside contracts.

The Defendants formed MiLanguages in 2004. Regardless of whether they agreed at the time of MiLanguages's formation to use MiLanguages as a vehicle through which to obtain future small business set-aside contracts, the fact is that this is precisely what the Defendants eventually did once SOCOM announced its plans for a follow-on contract in late 2006. On this point, the evidence shows that the Defendants, at this time, began to fashion MiLanguages into a potential vehicle by outwardly divesting their control over the company while maintaining actual control behind the scenes. The Defendants installed a nominee owner, Borsoi, who had no business or government-contracting experience and who was uninvolved in the day-to-day operations of MiLanguages. The Defendants controlled MiLanguages's sizable bank account and stock. For example, they told Borsoi he could only sell the stock back to Guillan if he chose to sell it at all. Borsoi's testimony makes clear that he was the president and owner of MiLanguages in name only, participating in the company's affairs and signing documents only when prompted to do so by Defendant Guillan.

To help prepare MiLanguages's bid for the 2007 Contract, Defendant Guillan hired a bid consultant (Strycharske) who had worked with BIB on other bids (including BIB's successful bid for the 2002 SOCOM contract) but who did

29

not advise either Defendant about whether MiLanguages was a small business for purposes of the eligibility criteria.  Nor could attorney Hadley offer this advice, as he testified that he was wholly unfamiliar with SBA size regulations or the SBA size determination process.  In short, at the time MiLanguages submitted its bid for the 2007 Contract, a bid that contained significant and material omissions and misstatements about the relationships between MiLanguages, BIB, and the Defendants, the Defendants had not solicited any legal opinion as to whether MiLanguages actually qualified as a small business.

Then, following the size protest and the SBA's initiation of a size determination, the Defendants, rather than fully disclosing all of the material facts to attorney O'Sullivan, misled O'Sullivan and caused her to submit additional false and misleading information to the SBA.  Included in the information submitted to the SBA were numerous misstatements about the relationships between MiLanguages, BIB, and the Defendants.  Material misrepresentations made to the SBA included the following statements:

> (1) MiLanguages's owners, officers, directors, key employees, and supervisors had never been employed by or performed similar work for BIB. (Defendant Guillan was a previous BIB employee who had performed work for BIB similar to the work he would perform for MiLanguages regarding government contracting.)

> (2) No affiliate, including BIB, had helped MiLanguages prepare its bid. (Defendant Blanchet's participation on BIB's behalf in preparing MiLanguages's bid, including discussing subcontracting arrangements and

helping obtain contingent financing for MiLanguages, all contradict this assertion.)

(3) The only past or current financial obligations between MiLanguages and BIB were exclusively those financial obligations, including "Accounts Payable [and] Accounts Receivable," that were ongoing as a result of MiLanguages's status as a subcontractor on the 2002 Contract. (MiLanguages failed to mention anything about BIB providing startup money to MiLanguages that had not been repaid and providing overdraft protection on MiLanguages's operating account.)

(4) Only individuals who were owners, officers, directors, employees, partners, or principal stockholders of MiLanguages had signed (or were expected to sign) documents to facilitate MiLanguages's ability to receive indemnifications or credit guarantees. (Defendant Blanchet, who was not an officer or director or otherwise officially affiliated with MiLanguages, within 30 days after this statement was made to the SBA, signed off on a $600,000 line of credit for MiLanguages that he personally guaranteed.)

(5) Defendant Guillan's sale of his MiLanguages stock was to Borsoi for fair and reasonable consideration at arms' length. (Borsoi did not buy the stock for money or other valuable consideration and did not become involved more than nominally in the operation of MiLanguages after his acquisition of the stock.)

(6) Defendant Guillan sold his shares to Borsoi to remain active in the industry without the extra work of running a business. (After the "sale," Guillan came to Borsoi for signatures, worked on MiLanguages's proposal for the 2007 Contract, and was otherwise heavily involved in the day-to-day operations of MiLanguages, while Borsoi played no substantial role.)

In applying for MiLanguages's credit line, Blanchet told BankFirst a story that was much closer to the truth about the relationship between the companies and the Defendants. Additionally, in performing the fraudulently obtained contract, the Defendants received millions of dollars in compensation while Borsoi—MiLanguages's putative owner and president—received only $63,000. And,

31

throughout this period, the Defendants repeatedly used or caused to be used wire transmissions (including phone calls and e-mails) in furtherance of their fraud.

On this record, a reasonable jury readily could have found the Defendants guilty of the charged conspiracy.

### 2.    Sufficiency of the Evidence: Wire Fraud Counts

The Defendants' primary contention as to the wire fraud counts goes to the government's role in each of the charged wire transfers: namely, due to the government's seizure of MiLanguages's BankFirst operating account prior to the dates of the charged transfers, no reasonable jury could have found that the Defendants were engaged in a scheme to defraud the government at that time.  The Defendants also raise estoppel and entrapment-by-estoppel arguments.

"The elements of mail and wire fraud are: (1) intentional participation in a scheme to defraud, and, (2) the use of the interstate mails or wires in furtherance of that scheme."  United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009) (citing United States v. Hasson, 333 F.3d 1264, 1270 and n. 7 (11th Cir. 2003); United States v. Ellington, 348 F.3d 984, 990 (11th Cir. 2003)).  "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."  Maxwell, 579 F.3d at 1299.  A misrepresentation is material if it has "a

32

natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed." Hasson, 333 F.3d at 1271.

"An interstate wire transmission is for the purpose of executing the scheme to defraud if it is incident to an essential part of the scheme or a step in the plot." Id. at 1272–73 (internal quotation marks omitted). "Section 1343 targets not the defendant's creation of a scheme to defraud, but the defendant's execution of a scheme to defraud." United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008). Therefore, "it punishes each interstate wire transmission that carries out that scheme." Id.

Here, the Defendants plainly knew, or could reasonably foresee, that use of the wires would follow from their submission of the invoices to SOCOM. First, the evidence established that the Defendants were experienced government contractors who had dealt with military contracting, and the military's payment system, in the past. Second, the use of the wires to transfer payments was prompted by MiLanguages's submission of invoices for work performed—indeed, the very purpose of their invoices was to obtain payment by wire transfer. Thus, the Defendants caused the charged wire transfers, which clearly furthered their scheme. See Pereira v. United States, 347 U.S. 1, 8–9, 74 S. Ct. 358, 363 (1954) (a person causes use of mail if he acts knowing that use of mail will follow or if he can reasonably foresee use of mail); Maxwell, 579 F.3d at 1299–1301 (11th Cir.

33

2009) (upholding wire fraud conviction where defendant received payments on fraudulently obtained government contract).

We addressed the "material misrepresentation[s]" made by the Defendants above, and will not separately restate the various misstatements made by the Defendants in the course of MiLanguages's bid on and performance of (including during the SBA's size determination) the 2007 Contract.

As to Count 2, which charged a wire transfer from DFAS to MiLanguages on July 15, 2010 (the day the seizure warrant was executed), a reasonable jury could easily find that the conduct that precipitated the transfer occurred before the execution of the warrant. Indeed, trial testimony established that MiLanguages incurred expenses before SOCOM paid for them, MiLanguages sent bi-weekly invoices to SOCOM, and DFAS did not pay MiLanguages until SOCOM approved the payments for work performed.

Moreover, the evidence abundantly established that all of the charged wire transfers furthered the Defendants' scheme. Each one moved money from DFAS to MiLanguages's account after MiLanguages sent SOCOM an invoice under the 2007 Contract. As the evidence established and the jury found, the Defendants obtained that contract fraudulently. Neither the government's criminal investigation—which was conducted by a separate part of the government (the U.S. Attorney) than the part of the government for which contractual services were

34

performed (the military)—nor execution of the seizure warrant terminated the 2007 Contract. There is no evidence to suggest that the government even could have terminated the 2007 Contract at that point, prior to the resolution of the criminal proceedings against the Defendants.

Indeed, when the seizure warrant was executed on July 15, 2010, the 2007 Contract, which had a five-year term, was still two years short of full performance, and no criminal charges had yet been brought against anyone associated with that contract. Although the Defendants contend that their scheme "terminated" when the criminal investigation began, SOCOM was not involved in that investigation and had no reason or ability to disregard its obligations under the contract with MiLanguages, which continued to submit invoices to SOCOM while the investigation was ongoing. Thus, despite the ongoing investigation, SOCOM remained obligated to pay for services rendered under the fraudulently obtained contract which, we note, had not yet been determined to be fraudulently obtained at that point. The mere initiation of a criminal investigation does not end a fraud scheme where the defendant continues to pursue the scheme. See, e.g., United States v. Hill, 643 F.3d 807, 825 (11th Cir. 2011), cert. denied, 132 S. Ct. 1988 (2012) (the defendant continued to fraudulently "flip" houses despite knowing that IRS had begun a criminal investigation for which he was receiving subpoenas).

35

In addition, we find the Defendants' arguments concerning estoppel and entrapment-by-estoppel are wholly without merit. To justify an entrapment-by-estoppel defense, "a defendant must actually rely on a point of law misrepresented by an official of the state; and such reliance must be objectively reasonable. . . ." United States v. Eaton, 179 F.3d 1328, 1332 (11th Cir. 1999) (internal quotation marks omitted). In this case, the Defendants proffered no evidence suggesting that they asked, or that any official told them, that it was legal for them to lie to SOCOM and the SBA for purposes of securing a $100 million government contract and then to accept payments from DFAS on that fraudulently obtained contract. Therefore, the Defendants' requests for the challenged wire transfers were at their peril.

We also decline the Defendants' request to expand the theory of equitable estoppel such that it would apply to this case. Simply put, while the government may have seized MiLanguages's operating account and controlled payments coming out of that account during the period in which the charged wire transfers occurred (and during which negotiations between the government and the Defendants as to the resolution of this case were ongoing), the government never told MiLanguages that it was required to continue submitting invoices and receiving payments under a contract that, it turns out, MiLanguages obtained by

36

fraud. There was no approval or ratification of the Defendants' fraudulent scheme, express, implied, or otherwise.

In sum, we conclude that the district court did not err in denying the Defendants' joint motion for a judgment of acquittal, as sufficient evidence amply supports both Defendants' convictions for conspiracy to defraud the United States and for five counts of wire fraud.

## B.    Trial Testimony Issues

### 1.    Jon Kane's Proposed Trial Testimony

The Defendants next assert that the district court erred by limiting the introduction of certain testimony, which impeded their ability to present a defense as to the intent element of the wire fraud charges, in violation of their constitutional rights to a fair trial.

Specifically, the Defendants sought to introduce testimony by Jon Kane, counsel for BankFirst, related to the government's involvement in the wire transfers that were the subject of the five substantive wire fraud counts. The government objected to Kane's testimony on various grounds, and outside of the presence of the jury, the Defendants proffered Kane's testimony.

In pertinent part, Kane was prepared to testify that he was retained by BankFirst after the government executed a seizure warrant on MiLanguages's BankFirst operating account. BankFirst had questions about how to handle the

37

account, and Kane's primary role was to "deal with the [g]overnment and the flow of money to . . . MiLanguages['s] account" on BankFirst's behalf over a one-year period of time that began when the government seized the account and continued while negotiations with the Defendants over the resolution of this criminal case were ongoing.

Kane would also testify that he had asked the government for advice about whether BankFirst should close MiLanguages's account after the seizure, that he and the government had agreed that SOCOM funds would continue to flow into the account but could not be released to MiLanguages without the government's approval, that the United States could "seize the account at any time" based on the warrant, and that defense counsel had not participated in those discussions.

The government argued that Kane's testimony might impermissibly suggest that the government had somehow abetted or approved the wire fraud because it allowed MiLanguages to continue to receive payments into the BankFirst account after the account was seized by the government pursuant to a warrant. The government also contended that because it had entered into a stipulation with the Defendants, which informed the jury of these facts, Kane's testimony was irrelevant.

38

After hearing argument from the parties, the district court sustained the government's objection, determining that Kane's challenged testimony was irrelevant, would be more prejudicial than probative, and would confuse the jury.

We review a district court's exclusion of defense evidence at trial for an abuse of discretion. United States v. Todd, 108 F.3d 1329, 1331–32 (11th Cir. 1997). However, when the district court's evidentiary rulings rise to the level of depriving a defendant of his constitutional right to present a defense, such rulings amount to constitutional error. See Chambers v. Mississippi, 410 U.S. 284, 302–03, 93 S. Ct. 1038, 1049 (1973).

A defendant's right under the Fifth and Sixth Amendments to present a defense "'is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor.'" United States v. Hurn, 368 F.3d 1359, 1363 (11th Cir. 2004) (quoting United States v. Ramos, 933 F.2d 968, 974 (11th Cir. 1991)). "In assessing a defendant's claims under the Fifth and Sixth Amendments to call witnesses in [his] defense," we first determine "whether this right was actually violated, [and] then turn to whether this error was 'harmless beyond a reasonable doubt' under Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 . . . (1967)." Hurn, 368 F.3d at 1362–63.

Given the stipulation that was read to the jury, and that other evidence was actually admitted showing that the five wire transfers all occurred after the

39

government seized MiLanguages's BankFirst account, the Defendants have not shown Kane's additional testimony was so "crucial, critical, [or] highly significant" to their defense that its exclusion actually rose to the level of a constitutional violation. See Ramos, 933 F.2d at 974. Kane's testimony as to the government's role on the back end of the charged wire transfers was cumulative of the stipulation, which established that (1) the charged wire transfers occurred after the government seized MiLanguages's account, and (2) the government continued to permit MiLanguages to perform under the 2007 Contract until October 2011. Whatever advice Kane received from the government concerning what BankFirst should do with MiLanguages's operating account was not relevant to any of the elements of the charged offenses because this advice was not given to either Defendant, nor did this advice constitute an endorsement of the Defendants' scheme.

What the Defendants essentially argue is that, despite their submission of MiLanguages invoices and requests for payment for work that was actually performed under the 2007 Contract, the government should have prevented the wire fraud by stopping payments under the 2007 Contract, in effect saving the Defendants from their own fraud. This argument is wholly without merit. Even if, as Kane's proffered testimony would indicate, the government did not require BankFirst to close MiLanguages's account or otherwise prevent withdrawals from

40

that account, the substantive wire fraud offenses were complete when DFAS transferred payments to MiLanguages for its work under the fraudulently-obtained 2007 Contract from Columbus through Atlanta to central Florida.  Whether the Defendants could then draw funds from MiLanguages's BankFirst account is immaterial.

Thus, we conclude that the Defendants have not shown that the district court erroneously excluded Kane's testimony.[8]

2.    Kenneth Dodds's Trial Testimony

The Defendants next argue that the district court abused its discretion by allowing Kenneth Dodds, the SBA's Director of Government Contracting, to testify about SBA's procedures and regulations concerning size determinations and investigations.

During its case-in-chief, and in addition to more than a dozen other witnesses, the government called the SBA's Dodds for the purpose of having him provide a "general overview" of the SBA's size determination process and other "foundational concepts for [the] SBA" based on his personal experience.  The Defendants objected to Dodds's testimony because Dodds was not personally involved in the MiLanguages size determination and was not disclosed or qualified

---

[8]Furthermore, because the district court did not abuse its discretion with regard to the limitations placed on Kane's testimony, the Defendants' argument concerning the district court's denial of their motion for a new trial, to the extent such motion was based on the exclusion of Kane's testimony, is without merit.

as an expert witness.  After hearing argument from the Defendants and the government, the district court overruled the Defendants' objection to Dodds's testimony, concluding that Dodds could testify as to the SBA's "background and procedures" and that the Defendants' arguments went more "to the weight of [Dodds's testimony], not to its admissibility."

At trial, Dodds, who had been with the SBA for 14 years, testified as to the SBA's mission and organizational structure, how the SBA receives size protests and conducts size determinations, and that, in his role as Director of Government Contracting, his office was responsible for setting the "size standards by which the [g]overnment measures what a small business is," writing "regulations that determine what a small business is," and "issu[ing] decisions that decide what a small business is."  On cross-examination, defense counsel questioned Dodds as to any role he played in the MiLanguages size determination, and he confirmed that while Dodds was familiar with the size determination process, he had not been involved with or supervised the MiLanguages size determination.

"According to Federal Rule of Evidence 701, a lay witness may offer opinions that are: '(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.' "  Hill, 643 F.3d at 840–41 (quoting Fed. R. Evid.

42

701). "[A]s we have held, however, Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." Id. at 841.

Here, Dodds's testimony was based on his own particularized, personal knowledge about the SBA, which he acquired over his 14 years of working for the SBA and having personal involvement in the SBA's procedures. His testimony was also helpful in understanding Smithfield's more specific testimony about MiLanguages's size determination process, the procedural context of that process, and the factors Smithfield evaluated in making his recommendation. Because Dodds offered no testimony about the specifics of this case, he could not, as the Defendants contend he did, suggest that the Defendants were involved in "sham" practices based on the information they reported to the SBA. Dodds's testimony was not expert testimony, and the district court properly refused to require that the government comply with the requirements for the admission of expert testimony before permitting Dodds to testify. See Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" the witness and his testimony meet certain criteria).

Because "Rule 701 does not prohibit lay witnesses [like Dodds] from testifying based on particularized knowledge gained from their own personal

experiences," and Dodds did not offer expert testimony, the district court did not

abuse its discretion in permitting Dodds to testify without being qualified as an

expert.  See Hill, 643 F.3d at 841.

## C.    Jury Instructions

The Defendants also argue that the district court erred in refusing to give two

of their requested jury instructions: a more detailed instruction on good faith as a

defense to willfulness, and an instruction defining the phrase "material fact" as it

related to the charge of conspiring to defraud the United States.

At trial, the Defendants requested a special jury instruction regarding good

faith as a defense to willfulness—Eleventh Circuit Pattern Criminal Special Jury

Instruction No. 9—that is ordinarily used in criminal tax cases.[9]  The government

requested a different good faith instruction—Eleventh Circuit Pattern Criminal

---

[9]This instruction requested by the Defendants reads as follows:

Good-Faith is a complete defense to the charge(s) in the indictment since good-faith on the part of the Defendants is inconsistent with willfulness, and willfulness is an essential part of the charges. If the Defendant acted in good faith, sincerely believing himself to be exempt by the law [from] the withholding of information from the SBA, then the Defendant did not intentionally violate a known legal duty—that is, the Defendant did not act "willfully." The burden of proof is not on the Defendant to prove good-faith intent because the Defendant does not need to prove anything. The Government must establish beyond a reasonable doubt that the Defendant acted willfully as charged.

Intent and motive must not be confused. "Motive" is what prompts a person to act." It is why the person acts.

"Intent" refers to the state of mind with which the act is done.

If you find beyond a reasonable doubt that the Defendant specifically intended to do something that is against the law and voluntarily committed the acts that make up the crime, then the element of "willfulness" is satisfied, even if the Defendant believed that ultimate good would result.

Special Jury Instruction No.17—that is applicable to any "charge that requires intent to defraud."[10]

In requesting Instruction No. 9, Defendants' counsel acknowledged that "this is not a tax fraud case, but given the specialized regulations, that's why the [D]efendants believed [Instruction No. 9 was] appropriate." The district court denied the Defendants' request to use Instruction No. 9 and granted the government's request to use Instruction No. 17, on the grounds that Instruction No. 9 would be "confusing to the jury."

The Defendants also requested that the district court read the jury a modified version of Eleventh Circuit Pattern Jury Instruction 13.6, which addresses the charge of conspiracy to defraud the United States under 18 U.S.C. § 371.[11] The

---

[10]The instruction requested by the government reads as follows:
      "Good faith" is a complete defense to a charge that requires intent to defraud. A defendant isn't required to prove good faith. The Government must prove intent to defraud beyond a reasonable doubt.

      An honestly held opinion or an honestly formed belief cannot be fraudulent intent—even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent.

      But an honest belief that a business venture would ultimately succeed doesn't constitute good faith if the Defendant intended to deceive others by making representations the Defendant knew to be false or fraudulent.

[11]Instruction No. 13.6, which the district court read to the jury without modification, reads as follows:
      It's a Federal crime for anyone to conspire or agree with someone else to do something that would be another Federal crime if it was actually carried out or to defraud the United States or any of its agencies.

45

Defendants' proposed modification was to add to the instruction the following

details concerning false statements and materiality:

> Some of the overt acts charged in the indictment involve false statements of material fact.  A material fact is an important fact—not some unimportant or trivial detail—that has a natural tendency to influence or is capable of influencing a decision of a department or agency in reaching a required decision.

> A statement or representation is "false" if it is about a material fact that the speaker knows is untrue or makes with reckless indifference to the truth, and makes with the intent to defraud.  A statement or representation may be "false" when it is a half truth, or

---

To "defraud" the United States means to cheat the Government out of property or money or to interfere with any of its lawful governmental functions by deceit, craft, or trickery.

A "conspiracy" is an agreement by two or more persons to commit an unlawful act. In other words, it is a kind of partnership for criminal purposes. Every member of the conspiracy becomes the agent or partner of every other member.

The Government does not have to prove that all the people named in the indictment were members of the plan, or that those who were members made any kind of formal agreement. The heart of a conspiracy is the making of the unlawful plan itself, so the Government does not have to prove that the conspirators succeeded in carrying out the plan.

The Government does not have to prove that the members planned together all the details of the plan or the "overt acts" that the indictment charges would be carried out in an effort to commit the intended crime.

A Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:
>
> (1)  Two or more people in some way agreed to try to accomplish a shared and unlawful plan;
>
> (2)  the Defendant knew the unlawful purpose of the plan and willfully joined in it;
>
> (3)  during the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the indictment; and
>
> (4)  the overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

An "overt act" is any transaction or event, even one which may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy.

46

effectively conceals a material fact, and is made with the intent to defraud.

The district court denied the Defendants' request to add this language to Instruction No. 13.6 on the grounds that it could confuse the jury.  In addition, the district court defined "false or fraudulent," "material," and "material fact" in these terms when instructing the jury on the substantive wire fraud counts:

> A statement or representation is false or fraudulent if it is about a material fact that the speaker knows is untrue or makes with reckless indifference to the truth, and makes with the intent to defraud.
> A statement or representation may be false or fraudulent when it is a half truth, or effectively conceals a material fact, and is made with the intent to defraud.
> A "material fact" is an important fact that a reasonable person would use to decide whether to do or not to do something. A fact is material if it has the capacity or natural tendency to influence a person's decision. It doesn't matter whether the decisionmaker actually relied on the statement or knew or should have known that the statement was false.

"We review a district court's refusal to give a requested jury instruction for abuse of discretion."  United States v. Fulford, 267 F.3d 1241, 1245 (11th Cir. 2001) (internal quotations and citations omitted).  "Under this standard, we examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled."  Id. (internal quotation marks omitted).  We will find reversible error only if: "(1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the

47

instruction substantially impaired the defendant's ability to prepare an effective defense." Id. While a district court judge is "vested with broad discretion in formulating [the] charge to the jury so long as it accurately reflects the law and the facts," United States v. Silverman, 745 F.2d 1386, 1395 (11th Cir. 1984), a "defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility," United States v. Lively, 803 F.2d 1124, 1126 (11th Cir. 1986) (internal quotation marks omitted).

The district court did not abuse its discretion by giving Instruction No. 17 rather than Instruction No. 9. Although the Defendants contend that their proposed instruction "provide[d] a more detailed instruction on the element of willfulness and when a defendant's good faith will serve as a defense to crimes which have willfulness as an essential element," the district court's instructions, taken together, sufficiently explained the Defendants' good faith defense. This is particularly true when Instruction No. 17, which was read to the jury, is considered in conjunction with the district court's other instructions, which required the jury to find that the Defendants had acted "knowingly" and "willfully" and that "[u]nlawful intent has not been proved if a [D]efendant before acting made a full and complete good faith report of all material facts to an attorney. . . and reasonably relied upon that advice in good faith." See Fulford, 267 F.3d at 1245 (jury instructions must be

48

"considered as a whole" in determining whether the district court "sufficiently instructed the jury").

The district court separately defined "knowingly" as "an act . . . done voluntarily and intentionally and not because of a mistake or by accident," and it defined "willfully" as "committed voluntarily and purposely with the intent to do something that the law forbids, that is, with the bad purpose to disobey or disregard the law." The instructions, taken as a whole, thus covered the concepts of good faith and willfulness, concepts which the Defendants contend justified the giving of Instruction No. 9. In addition, Instruction No. 17 more clearly aligned with the facts at issue in this case than did Instruction No. 9, and the district court did not abuse its discretion in concluding that instructing the jury in the manner requested by the Defendants ran the risk of confusing the jury with an extraneous instruction on the concept of motive.

Nor did the district court abuse its discretion in denying the Defendants' request to instruct the jury using the modified conspiracy Instruction 13.6 with the additional definitions. These terms were defined in nearly identical terms in the district court's instructions to the jury on the elements of wire fraud, and as such, the Defendants' modified Instruction 13.6 was merely cumulative of the district court's other instructions. See Fulford, 267 F.3d at 1245.

49

## D.    Reasonableness of Defendants' Sentences

Finally, the Defendants argue that their identical 36-month, below-guideline range sentences are procedurally unreasonable because the district court improperly calculated the loss for which they were accountable, and thus, erroneously calculated their adjusted offense levels under the Sentencing Guidelines.

Prior to the Defendants' sentencing hearing, the U.S. Probation Office prepared a presentence investigation report ("PSI") for each Defendant.  The probation officer grouped all of six of each Defendant's counts of conviction together and calculated a base offense level of seven, pursuant to U.S.S.G. § 2B1.1(a)(1).  Because the total intended loss from the Defendants' fraudulent scheme was $100 million (the ceiling for the 2007 Contract), the probation officer imposed  a 24-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(M).  With a criminal history category of I and a total offense level of 31, each Defendant's total adjusted guideline range was 108 to 135 months' imprisonment.

The Defendants objected to the loss amount calculated in the PSI because (1) there was no actual harm to or loss sustained by the government, and (2) they did not intend to harm SOCOM, as they intended for the terms of the contract to be fully and satisfactorily performed.  The probation officer responded by stating that, for government benefits fraud, U.S.S.G. § 2B1.1, cmt. (n.3(F)(ii)) stated that the

50

loss was no less than the "value of the benefits obtained by unintended recipients or diverted to unintended uses." Citing United States v.Maxwell, 579 F.3d 1282 (11th Cir. 2009), the probation officer noted that this Court had applied this rule for calculating loss in government benefits fraud cases to calculating loss in cases of preferential contracting fraud. Because in this case MiLanguages procured the $100 million small business set-aside contract through fraud, the loss amount was no less than $100 million, pursuant to Maxwell and § 2B1.1, cmt. (n.3(F)(ii)).

At sentencing, after hearing argument from both Defendants and the government, the district court overruled the Defendants' amount-of-loss objection and adopted the calculation of the loss amount and guideline ranges as stated in the PSIs. The court noted that it had relied on Maxwell, which was "loud and clear as to how these losses are to be calculated," to determine that the appropriate amount of loss here was the entire, $100 million value of the contract that was diverted to an ineligible recipient, MiLanguages. Accordingly, each Defendant's total adjusted guideline range was 108 to 135 months' imprisonment.

The district court then sentenced each Defendant to 36 months' imprisonment on each count, with the sentences to run concurrently. The district court, in explaining its sentencing decision, noted that although the loss amount of $100 million was correct, that loss amount and the Defendants' adjusted guideline

ranges overrepresented the seriousness of the Defendants' offenses, such that a sentence below the range was appropriate.

We review the reasonableness of a sentence for abuse of discretion using a two-step process. United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). We look first at whether the district court committed any significant procedural error, such as miscalculating the advisory guidelines range, treating the guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to explain adequately the chosen sentence.[12] Id.

The Sentencing Guidelines provide that the offense level should be increased based on the amount of loss involved. U.S.S.G. § 2B1.1(b)(1). Generally, the loss is the greater of the actual or intended loss, where actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense" and intended loss is the "pecuniary harm that was intended to result from the offense." Id. § 2B 1.1, cmt. (n.3(A)(i)–(ii)).

The Commentary to the Guidelines provides that, in cases involving procurement fraud, the reasonably foreseeable pecuniary harm includes "the reasonably foreseeable administrative costs to the government and other

---

[12]While we would ordinarily next assess whether the Defendants' sentences are substantively reasonable in light of the § 3553(a) factors, the Defendants have not raised any argument with regard to the substantive reasonableness of their sentences, and thus, they have waived any argument as to this issue.

participants of repeating or correcting the procurement action affected," in addition to any increased costs to procure the service involved that were reasonably foreseeable. Id. § 2B1.1, cmt. n.3(A)(v)(II)). However, if there is a loss, but the loss cannot reasonably be determined, the alternative measure of loss is "the gain that resulted from the offense." Id. § 2B1.l, cmt. (n.3(B)). Furthermore, in cases involving government benefits, including grants, loans, and entitlement programs, "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses." Id. § 2B1.1, cmt. (n.3(F)(ii)).

In United States v. Maxwell, the defendant participated in a fraudulent scheme to obtain construction contracts set aside for socially and economically disadvantaged companies through the Community Small Business Enterprise ("CSBE") program and the Disadvantaged Business Enterprises ("DBE") program. Maxwell, 579 F.3d at 1287–88. The CSBE program set aside a certain percentage of Miami-Dade County's construction work for qualifying small, local businesses. Id. at 1288. This Court concluded that the CSBE and the DBE programs at issue were government-benefits programs under § 2B1.1, noting that the primary purpose of those programs was to help small minority-owned businesses develop and grow, create new jobs, and overcome the effects of past discrimination in the construction industry. Id. at 1306. This Court noted that, unlike in standard

construction contracts, the contracts at issue in <u>Maxwell</u> focused "mainly on who is doing the work." <u>Id.</u> This Court went on to approve the reasoning contained in other circuits' decisions which stated that the DBE and similar programs were entitlement program payments because they were affirmative action programs that gave exclusive opportunities to certain minority and women owned businesses. <u>Id.</u> As such, the appropriate amount of loss was the entire value of the CBSE and DBE contracts that were diverted to the unintended recipient. <u>Id.</u>

Congress's policy is that small businesses be awarded "a fair proportion of the total purchases and contracts" from the federal government. 41 U.S.C. § 3104. Further, Congress has declared that the government "should aid, counsel, assist, and protect" small businesses to ensure that a fair proportion of the government's total purchases and contracts for goods and services be placed with small business enterprises. 15 U.S.C. § 631(a).

Here, given <u>Maxwell</u>, the Defendants have not shown that the district court erred by determining that the appropriate loss amount was the entire amount of the contract at issue, $100 million, such that the 24-level increase was appropriate. Specifically, the small business set-aside contract at issue in this case was set aside to provide exclusive opportunities to small businesses, just as the DBE and CBSE contracts in <u>Maxwell</u> were set aside to provide opportunities to minorities and women. <u>See Maxwell</u>, 579 F.3d at 1306. Despite the Defendants' argument that

54

the government benefitted from the contract rather than losing from it, Congress has emphasized that there is a concern in ensuring that small businesses have a fair proportion of federal contracts because of the benefit that the nation receives from having a strong class of small businesses. See 15 U.S.C. § 631(a); Maxwell, 579 F.3d at 1306. By defrauding the government to obtain the contract, the Defendants prevented the government from awarding the contract to a legitimate small business, and therefore, deprived other small businesses of the ability to obtain this contract.

Because of the similarities between the programs and criminal conduct at issue in Maxwell and the small business program and criminal conduct at issue here, the Defendants' argument that Maxwell is distinguishable because it did not involve a small business program is without merit. Therefore, the district court correctly applied this Court's holding from Maxwell: the amount of loss in cases involving government benefits programs equals the entire amount of the contract at issue. See Maxwell, 579 F.3d at 1306. As such, the district court did not err here by attributing the entire amount of the contract at issue—$100 million—to the Defendants as loss, and applying a corresponding 24-level increase to their offense levels.

## IV.  CONCLUSION

In light of the foregoing, and following our review of the record and oral argument in this case, we find no reversible error and affirm the convictions and sentences of Defendants Blanchet and Guillan.[13]

**AFFIRMED.**

---

[13]Because the Defendants have not established that the district court committed any reversible error, they consequently cannot establish cumulative error necessitating the reversal of their convictions. United States v. Khanani, 502 F.3d 1281, 1295 (11th Cir. 2007).

56